STATE

v.

Katherine BUNNELL, alias Jane Doe.

No. 2010–388–C.A.

Supreme Court of Rhode Island.

June 22, 2012.

Lauren S. Zurier, Department of Attorney General, Providence, for State.

Christopher S. Gontarz, Esq., Middletown, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

On October 31, 2004, three-year-old Thomas J. Wright[1] lost his life as a result of extensive injuries that tragically had been inflicted upon him by his aunt and

---

1. The record generally refers to Thomas J. Wright by his nickname, "TJ." Therefore, we shall do likewise.

her boyfriend after they returned home from a night of drinking. The defendant, Katherine Bunnell, was convicted by a jury of second-degree murder and of conspiracy to commit the offense of murder. As a result, she was sentenced to consecutive terms of life imprisonment at the Adult Correctional Institutions (ACI) for the murder conviction and ten years to serve at the ACI for the conspiracy conviction. The defendant now appeals on two grounds. First, she contends that the trial justice erred by excluding from evidence certain portions of an interview given by her boyfriend, Gilbert Delestre, at the Woonsocket Police Department the day before TJ died. Second, she asserts error in the trial justice's denial of her motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

The facts surrounding this appalling infanticide are recorded in some detail in our opinion concerning Bunnell's boyfriend and coconspirator, Gilbert Delestre. *See State v. Delestre*, 35 A.3d 886, 888–90 (R.I.2012); *see also In re Destiny D.*, 922 A.2d 168, 170–72, 175 (R.I.2007) (upholding the termination of the parental rights of defendant and Delestre with respect to their two children). For the purposes of this appeal, we relate only such facts as are germane to the issues raised by defendant.

On October 29, 2004, defendant and Delestre left their two children and defendant's three nephews in the care of a fifteen-year-old babysitter, Kayla, so that they could enjoy a night out.[2] They left their Woonsocket apartment around 7 p.m. and returned at approximately 2:30 a.m. the following morning.[3] At trial, Kayla testified that TJ, defendant's three-year-old nephew, had been having difficulty going to sleep and that, around 12 or 12:30 a.m., she let him lie down on the couch in the living room. She then lay down on the floor next to the couch and eventually fell asleep. Kayla said that she was awakened by defendant walking in the front door, screaming multiple times, "What happened to my f* * *ing house? Why is there a mess all over my floor?" with Delestre following behind her. Kayla testified that she "saw milk and yogurt and [something else she could not identify] mixed together," which had spilled out of a bowl and landed on the carpeted area of the floor. TJ was no longer on the couch where Kayla had left him, so she told defendant "that TJ might have done it." Kayla testified that defendant "didn't really say anything[,] but [Delestre went] upstairs," after which she heard three or four "loud slaps" and then heard TJ crying.

Kayla testified that, thereafter, defendant went upstairs and, after loudly questioning TJ's brother, she brought TJ

---

2. In addition to her own two children, ages one and three, defendant took over the care and custody of her three-year-old niece and three nephews, ages two, six, and ten, after defendant's sister went to jail. The defendant's three-year-old niece, however, subsequently went to live with her father and did not reside with defendant at the time of this incident.

3. Kayla testified that when defendant asked her to babysit on this occasion, she informed defendant that she "had to go to a football game the next day because [she] was part of [her high school] band," so she "needed to be home by eleven, eleven thirty at the latest." The defendant acknowledged that she had agreed to be home by 11:30 p.m., at the latest, but testified that "[s]ome things happened that prolonged [her return home] that night [causing her] to have to stay at the bar that late."

downstairs, grasping him by his arms and dangling him in front of her. Kayla further testified that every time defendant would "step down on a stair, her knee would hit him in the back." When defendant reached the last step,[4] according to Kayla, defendant "just dropped" TJ from approximately two to two-and-a-half feet off the ground. TJ "landed on his stomach, and the side of his face hit the floor," which caused his head to "bounce up a little bit." Although TJ attempted to get up, Kayla stated that defendant "grabbed him by his wrists and ripped him up off the floor," causing TJ to whimper.[5]

Kayla further averred that defendant "pulled" TJ towards the table where the mess was, while continuing to rant about the disarray of her apartment. TJ said nothing, but merely stood before defendant, crying. Kayla testified that defendant hit TJ on his back and in his chest approximately three or four times "with a closed fist," in a manner where "the palm and the knuckles of her hand were hitting him." The defendant's attack caused TJ to fall to the ground, onto his stomach, with the side of his face again hitting the floor. According to Kayla, defendant "picked him back up by his wrist again" and continued hitting him another three or four times in the chest, all the while continuing to scream at him.

Kayla further testified that when defendant attempted to pull TJ up off the floor after he had been knocked down a third time, the toddler "didn't stand up, he just kind of fell" onto his back, causing "[t]he back of his head [to] hit the floor and * * * bounce[ ] a little bit[,] and then he

just laid there." According to Kayla, defendant "ha[d] one hand on [TJ's] wrist, so [he was] maybe an inch and a half off the floor, and then she slap[ped] him" back and forth across his face four times, with an open hand. With each slap defendant administered to the three-year old's cheek, Kayla said that TJ's "face would turn that way and hit the floor," and defendant would "call[ ] him stupid," yelling at him: "Why did you mess up my floor? Why would you do this to my living room? What's the matter with you?" Kayla compared the force that defendant used on the child to two "teenage girls * * * fighting."

Kayla testified that defendant then "yanked [TJ] off the floor" and "pulled him over towards the closet." She further stated that TJ "fell backwards," causing "his back and his head [to] hit the door, and [that] he just sat there leaning up against the closet door." Then defendant slapped TJ in the face again, with a force that Kayla proclaimed was "[l]ike two teens fighting." TJ remained sitting on the floor, crying, "just leaning up against the door." Kayla said that defendant then "took milk and poured it on [TJ's] head" for "maybe ten seconds," and she added that TJ, although still crying, made no attempt to move.

The defendant then asked Kayla if she wanted to go home. Kayla said that she did, and defendant began looking for her car keys. Kayla testified that she turned to look outside and that when she turned back around, she saw TJ "about two and a half to three and a half feet in the air[,] falling down" toward her and defendant, as if "he had been thrown." She attested

---

4. There are inconsistencies in the record concerning whether defendant had been standing on the last step or on the floor at this point. During trial, Kayla testified that defendant was standing on the last step; however, on two prior occasions, while under oath, she

stated that defendant had been standing on the floor when she dropped the toddler.

5. At a previous Family Court hearing, however, Kayla described defendant's actions when she grabbed TJ's wrists as "helping him up."

that the child traveled approximately four to five feet through the air, away from where Delestre was standing. Kayla stated that Delestre's "arms were falling back to his waist[,] and [that] he told [defendant] to 'get [TJ] out of here before' he 'drops him.'" Kayla indicated that "[TJ] landed on his stomach, but his leg was twisted up underneath his stomach," as "if he was sitting * * * Indian style." Kayla further testified that she believed it was TJ's left leg that landed in the twisted manner and that TJ's face again hit the floor when he landed.

According to Kayla, defendant went over to TJ and "just picked him up" by his wrists "until he was on his feet[,] and then she reached under his arms * * * to pick him up and she carried him over to the stairs." The defendant then continued to search for her keys. At that point, Kayla testified, Delestre also went over to TJ, "picked him up and brought him up * * * two steps and then just put him down." Kayla further attested that TJ just "leaned against the wall"; "[h]e was breathing heavy and * * * letting his body weight fall on the floor. He wasn't trying to hold himself up."

The defendant testified that when she returned to her apartment after driving Kayla home, Delestre "walk[ed] towards [her] * * * and he said, 'Go upstairs and check TJ,'" while making a motion like something was wrong with the toddler. According to defendant, she "immediately * * * ran upstairs," went into the bedroom, and called out TJ's name. When TJ "didn't sit up or anything," defendant brought the child to the bathroom, "took water from the sink[,] and [she] put it on [TJ's] head [because she thought that] he would snap out of it and get conscious." She testified that she knew that TJ was

"unconscious" because he was "limp when [she] picked him up." The defendant attested that she screamed, "Call 9–1–1" and that TJ "looked blue." She further averred that "he wasn't like that" before she left to drive Kayla home.

Edward Bertholic, a lieutenant on the rescue for the Woonsocket Fire Department, testified that he arrived at defendant's apartment at 3:31 a.m. on October 30, 2004, in response to a 911 dispatch call that reported an ill child. When Lt. Bertholic first saw TJ, he noticed "some traumatic injuries," as well as vomit and blood in and around his mouth. Further, Lt. Bertholic testified that there "was a lot of swelling and bruising around [the child's] eye and forehead," and he likened the appearance of TJ's head injuries to "somebody that lost a boxing match or something like that." According to Lt. Bertholic, TJ's left arm "was deformed and bruised and it looked like it was possibly broken" and the child had similar injuries on "his leg in the thigh area." Additionally, Lt. Bertholic testified that defendant told him "that they [came] home and found the child like that in the crib."

Patrolman Peter Menard and Lieutenant Norman Galipeau [6] of the Woonsocket Police Department arrived on the scene that night. Patrolman Menard testified that he spoke with defendant, who informed him that after returning from a club to which she, Delestre, and Delestre's cousin Jose Santiago had gone, she sent Delestre and Santiago "into the house [to] get the babysitter while she waited outside in the car," and that, "when the babysitter came out, she brought the babysitter home and then returned." According to Ptlm. Menard, defendant "didn't really have a lot of emotion" and did not seem distraught.

6. In October 2004, Lieutenant Galipeau held the rank of sergeant; however, we will refer to him with respect to his current title of lieutenant.

Lieutenant Galipeau testified that Delestre informed the officers that he "had gone upstairs to check on the kids and * * * he noticed that TJ was limp, half in and half out of his bed." According to Ptlm. Menard, Delestre was asked "where everything took place and where it happened," to which he replied that "it happened upstairs." The officers accompanied Delestre to the second floor, and defendant followed behind them "a few minutes later." Patrolman Menard testified that when they questioned TJ's older brothers about what had happened to TJ, defendant directed the children to "tell the police what the babysitter did." He further testified that she made this demand "[a]t least three times," going "from almost a calm voice to a yelling voice," finally shouting at them: "Tell the f* * *ing police what the babysitter did to TJ."

Unfortunately, TJ's prognosis was very grim. Around 6:30 a.m. on October 30, 2004, the child was in a comatose state. His face had acute, extensive bruising, according to Reena Isaac, M.D., who then was completing a two-year fellowship program in forensic pediatrics at Hasbro Children's Hospital. She testified that a CAT scan showed that, "on the left side [of TJ's brain, there was] a moderate to large subdural hematoma or hemorrhage, which means, essentially, bleeding on the brain," as well as "significant cerebral edema or brain swelling." Doctor Isaac stated that TJ's injuries were "consistent with blunt-force trauma onto the child multiple times," clarifying that "excessive force" had been used because "[y]ou don't see these injuries in accident[s]." An MRI was performed on October 31, 2004, which according to Dr. Isaac, showed "cerebellar infarction, [which] means tissue or cell death" of the brain. Doctor Isaac further explained that when "the tissue dies, the organ begins to die. Once the brain death occurs, the rest of the body follows." Around noon that same day, TJ was "pronounced brain dead." Approximately thirty minutes later, the child was taken off life support.

Peter A. Gillespie, M.D., testified concerning the findings of TJ's autopsy.[7] Doctor Gillespie stated that, at the time of his death, TJ weighed thirty-two pounds and was thirty-six inches tall. He testified that "[t]here were multiple blunt traumatic injuries of the head, including injuries on the left cheek, the left ear, the temple area, the right ear, as well as injuries present on the forehead." The child's head injuries included five bruises on his forehead that ranged in size from one-third of an inch to one inch long in dimension, "a large area of contusion or bruising on the left side of the forehead, measur[ing] approximately four by six inches," and bruising to TJ's left eye, right eyebrow, cheekbone, and from the front of his left ear to the back of it. On TJ's left cheek, "there was a large patterned injury," consisting of "four parallel lines and impressions that were purplish/red in color" and separated by pale areas, which was "consistent with a slap mark inflicted by an open hand." There were injuries to the child's lips, and "the tongue itself had multiple traumatic injuries consistent with bite marks. * * * These were quite deep bite marks and there was a lot of associated hemorrhage within the tongue itself." As a pathologist, Dr. Gillespie stated that the tongue injury was significant because:

7. The autopsy was performed and a corresponding report was completed by Dorota K. Latuszynski, M.D.; however, because Dr. Latuszynski was on medical leave, Dr. Gillespie testified to his findings about his review of the case file, which included the final autopsy report, the neuropathology report, the radiology consult report, glass slides, x-rays, police reports, and witness statements.

"a considerable amount of force needed to be applied to TJ in order for that to happen. We do see bite marks in some other types of deaths, * * * [but] we don't see the extent of hemorrhaging bite marks that were seen in this case. I think this was probably one of the worst ones I've seen as far as bite marks go."

Doctor Gillespie further testified that there was acute "subgaleal hemorrhag[ing]" on the sides and the top of TJ's head, which was "consistent with blunt-force trauma." An examination of TJ's brain exposed "a large left-sided subdural hematoma" and "a slight shift of the structures of the brain from the left side to the right side," which was "consistent with some type of traumatic injuries." "Bruises [were] located within the brain itself," and "the brain was moderately to markedly swollen," which Dr. Gillespie attested occurs either "as a result of direct blunt-force injury" or "as a result of * * * contra coup." [8]

Further, Dr. Gillespie testified that "there were acute compression fractures" on TJ's vertebrae, which would be consistent with the "application of some sort of blunt-force trauma * * * to the top of the head" or "a fall where someone lands directly on their feet or their buttocks[, such that there is] an up and down type of application of force." According to Dr. Gillespie, "the totality of the injuries inflicted on [TJ] * * * led to his death"; and, although the order that the injuries were inflicted could not be determined, "it [could] be determined that they were all inflicted while [TJ] was alive." Further, Dr. Gillespie estimated that the injuries

took place "minutes to, at most, hours prior to his hospitalization."

Doctor Gillespie opined that the medical findings related to TJ's blunt-force-trauma injuries were consistent with Kayla's description of the night's events and, specifically, that it was "possible" that the break of TJ's femur was consistent with the way Kayla reported that he had been thrown across the room. Further, according to Dr. Gillespie, the associated symptoms of a head injury are that the person "would become lethargic, he might appear sleepy or he might even appear comatose. He would probably have decreased verbalization or probably not be talking as much."

The grand jury returned an indictment against defendant on January 21, 2005, charging defendant with murder and conspiracy to commit murder. The defendant's jury trial took place in May 2008, which resulted in second-degree murder and conspiracy convictions. Thereafter, defendant motioned for a new trial, which motion was heard and denied by the trial justice on May 22, 2008. The defendant's sentencing hearing was held on October 6, 2008, at which time the trial justice stated:

"I believe that the defendant caused what happened [to TJ] that night. She was the one who instigated what happened that night and she started the whole thing rolling. She's the one who dragged him downstairs. She's the one who dragged him across the room. She's the one who hit him as described by Kayla. She dragged him back across the room and she was there when Delestre flung that child across the room and he landed, as they said, Indian style.

"We know from the testimony of the medical examiner that that fracture that he suffered, and we saw the pictures of

---

8. Doctor Gillespie explained that contra coup is "a phenomenon that [is] occasionally see[n] where bruises occur directly opposite the point of impact of a blunt-force trauma," which he further explained is "most often seen when people fall and hit the back of their head."

it, so displaced, that had to have happened at that point, and that probably was enough right there, with everything else that happened, to be the cause of death. She was there. And, what did she do? Not as described by others as having maternal instincts, she got in the car and drove off with the babysitter. That was not somebody who was trying to save this child. No way was she trying to save this child. She was angry and out of control.

"* * *

"And so, I'm sure what the defendant does not understand is that no, she did not get up one morning and plan out on a deliberate murder of this child, but by her wanton disregard for his life, it was the equivalent of that. And so, from that point of view, the Court is not at all impressed by the defendant's contention that she did not intend his death. Her behavior that night was tantamount to the same thing as if somebody just sat out and planned somebody's death."

The trial justice sentenced defendant to life in prison at the ACI for the murder conviction and to ten years at the ACI for the conspiracy conviction, the sentences to be served consecutively; a judgment of conviction was entered on October 22, 2008. The defendant filed a notice of appeal on October 8, 2008.[9]

Further facts will be provided as may be necessary to discuss the issues raised on appeal by defendant.

## II

### Discussion

The defendant appeals to this Court on two grounds. First, she contends that the trial justice erred by failing to admit, under Rule 804(b)(3) of the Rhode Island Rules of Evidence, the entire videotape and/or transcript of an interview of Delestre, at the Woonsocket police station on October 30, 2004, that defendant alleges exculpated her from the charges of which she ultimately was convicted of. Second, she asserts error in the trial justice's denial of her motion for a new trial.

### A

### Rule 804(b)(3)

The defendant's theory of defense was that although she acted offensively and objectionably with TJ on the night in question, her behavior was neither the cause of nor a contributing factor to the child's death. The defendant attempted to demonstrate that the vicious beating TJ suffered occurred after she had left the apartment to bring the babysitter home and that, therefore, the fatal blows to TJ happened exclusively at the hands of Delestre. The crux of her defense rested on her own testimony as well as the introduction of Delestre's police interview in which he described how, after defendant had left the apartment, he "[g]ave [TJ] a backhand right in the forehead" while on the stairs, which caused TJ to fall backward, and "flip" down the stairwell.

Prior to trial, the state filed a motion in *limine* to preclude the admissibility of Delestre's interview. At the pretrial hearing on this motion, the state argued that Delestre's interview was not admissible under Rule 804(b)(3) because, although some of

---

9. Although defendant filed her notice of appeal before the judgment was entered, as we noted in *State v. Menard*, 888 A.2d 57 (R.I. 2005), "[n]ot only does [Article I,] Rule 4(b) [of the Supreme Court Rules of Appellate Procedure] treat as timely a notice of appeal filed before entry of a judgment or order, but this Court consistently has excused such a practice 'in the interests of justice and to avoid undue hardship.'" *Menard*, 888 A.2d at 59 n. 2 (quoting *State v. Hallenbeck*, 878 A.2d 992, 1020 (R.I.2005)).

the declarations Delestre made were against his penal interest, the corroborating circumstances did not clearly indicate their trustworthiness, as is required by the rule. In the alternative, the state proposed that if Delestre's interview were to be admitted, it should be redacted so as to include only those statements that actually were against Delestre's penal interest. After viewing the recording, the trial justice concluded that there was "some corroboration" and that his "inclination would be to allow" the interview to be introduced, but he reserved judgment on the issue. He did, however, suggest that the state and defendant "at least try to agree on those portions [of the interview] that [could] be redacted pursuant to the rule."

At trial, after finding that Delestre was an unavailable witness,[10] the trial justice confirmed his prior determination on the admissibility of the interview under Rule 804(b)(3), explaining that:

**10.** Outside the presence of the jury, Delestre was called as a witness. He asserted his Fifth Amendment privilege against self-incrimination, thereby refusing to testify.

**11.** The defendant argues that the following statements should have been admitted into evidence:

"[1] [Delestre]: So I don't know, the house was trashed, and then my girlfriend started yelling at the babysitter like what the f* * * happened, you know, and we go upstairs, and then you got the 3 year old up at 2:00 in the morning, you know, and then she like just slapped him once, and like there was a little bit of milk or something, and she dumped it like threw it over at him or something, because she was so pissed off.
" * * *
"[2] [Detective]: What about earlier in the night though when Kayla and * * * [defendant] were leaving, did you discipline him at that point?
"[Delestre]: No.
" * * *
"[3] [Detective]: You didn't throw him around?

"[I]n considering the rule, it seemed to me that, clearly, [Delestre's] statements against penal interest come in if they were, essentially, in aid of the accused, and as indicated by the rule, that the trustworthiness * * * went by corroborating circumstances.

"And, as I indicated, it seemed to me that not only because of the timing of it, that is, that it was only hours after the incident, to whom it was made, a police authority whom he knew as a mentor at one time, because it was on the tape and because of the fact that, according to the medical testimony, it was at least possible that it could have happened in a light described by the declarant, I think there's enough corroboration testimony or evidence there to allow this to come in at this time."

The defendant objected specifically to the redaction of six excerpts[11] that the trial

"[Delestre]: I swear to God, I wouldn't do that.
"[Detective]: Gilbert, you've gotta be honest with me.
"[Delestre]: I swear to God Todd, I'm serious.
"[Detective]: [Kayla's] walking out the door, she turns around, and she sees him flying through the air. TJ's not Superman; he's not gonna be flying.
"[Delestre]: Well then she's lying because—
" * * *
"[4] [Delestre]: Yeah but she didn't really spank him, you know, that hard.
" * * *
"[Delestre]: Yeah but it wasn't like she was like trying to f* * *ing hurt him and sh* *; it's just that he was being bad, you know.
"[5] [Detective]: And where was he at the time, was he lying on the floor?
"[Delestre]: No, he was, he was standing up.
" * * *
"[6] [Delestre]: —She, [defendant] smacked him, you know, so.
"[Detective]: several times and—
"[Delestre]: —so I wouldn't touch him, you know."

justice had found to be "less against [Delestre's] penal interest and more exculpatory of [defendant]," which she argued "should have been admitted and included" because "by exculpating her, he [was], in fact, inculpating himself and thereby [it was] against his penal interest." The trial justice further stated that he "would not allow the [excerpts] * * * because of the fact that they did not expose [Delestre] to criminal liability," and he noted that he allowed, "for the sake of completeness, perhaps more of the declarant's [interview] than would normally have been allowed."

The defendant subsequently called Detective Sergeant Todd R. Brien to testify about Delestre's October 30, 2004 interview. The defendant also introduced into evidence the transcript and videotape of Delestre's interview, both of which had been redacted.[12] The following is gleaned from Delestre's edited interview: After defendant left to bring Kayla home, Delestre was cleaning up the mess while TJ stood by, watching him. As Delestre walked up the stairs to bring TJ to bed, he told TJ that he was a "bad boy" and "tapped him in the head," causing TJ to fall "a little funny" down six stairs. When TJ fell, he "did a flip" and then "got unconscious right away." Delestre then "picked [TJ] up and [brought] him upstairs, [and] put

him on his bed," but because TJ looked "like he got a concussion or something," Delestre "made sure [TJ] said something to [him]." Further, Delestre admitted that he tried to place the blame for what happened to TJ on the babysitter.

On appeal, defendant argues that the trial justice erred by failing to admit the interview in its entirety under Rule 804(b)(3).[13] The defendant contends that "the use of selected aspects of the [interview] created a misleading impression" and that, therefore, the "exclusion of a portion of this [interview] led to the arbitrary rejection of valuable evidence." In support of her argument, defendant points to the evidence treatises of Deans John H. Wigmore and Charles T. McCormick, as well as to Rule 106 of the Rhode Island Rules of Evidence,[14] and she "urges this Court to adopt a rule of completeness once a trial court rules that the evidence is admissible under [Rule] 804(b)(3)".

The state rebuts defendant's proposition that we adopt a "rule of completeness" in relation to Rule 804(b)(3), contending that the six excerpts at issue were appropriately "excluded from evidence because they were not sufficiently against [Delestre's] penal interest to justify their admission." The state cites *Smith v. State*, 647 A.2d

12. The state objected to the admission of Delestre's statements during the trial and requested "a continuing line of objection." The defendant also objected to the redacted version of the interview that the trial justice determined to be admissible, arguing that the six excerpts that were redacted "should have been admitted and included."

13. Rule 804(b)(3) of the Rhode Island Rules of Evidence provides an exception to the hearsay rule when the declarant is unavailable as a witness and has made a statement against his or her interest. Rule 804(b)(3) defines a statement against interest to be: "A statement which was at the time of its making so far contrary to the declarant's

pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

14. *See* Section II B, *infra,* of this opinion for our discussion of Rule 106 of the Rhode Island Rules of Evidence.

1083, 1088 (Del.1994), and argues that "[n]on-self-inculpatory statements * * * are simply rank hearsay that do[ ] not enjoy any special guarantee of reliability."

■■ "The rationale for [Rule 804(b)(3) ] is that people are not likely to make statements that are damaging to themselves unless they believe them to be true." *State v. Lynch,* 854 A.2d 1022, 1038 (R.I.2004) (quoting Rule 804(b)(3) Advisory Committee's Note). "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *State v. Pacheco,* 763 A.2d 971, 977 (R.I.2001) (quoting *Williamson v. United States,* 512 U.S. 594, 603–04, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). In determining the trustworthiness of declarations made against one's penal interest, this Court has established three considerations: "[F]irst, the timing of the declaration and the party to whom the declaration was made; second, the existence of corroborating evidence; and third, the extent to which the statement is truly against the declarant's penal interest." *Id.* at 978 (quoting *State v. Firth,* 708 A.2d 526, 531 (R.I.1998)).

■ Rule 804(b)(3) is an exception to the hearsay rule, and the admissibility of any such statement thereunder "is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous." *Lynch,* 854 A.2d at 1038. However, the issue before this Court in this case is not whether the trial justice abused his discretion by allowing Delestre's interview into evidence, but whether the trial justice erred by admitting only portions of it under Rule 804(b)(3), rather than in its entirety.

To resolve the issue of what may be properly admitted or excluded under Rule 804(b)(3), "we must first determine what the Rule means by 'statement.'" *Williamson,* 512 U.S. at 599, 114 S.Ct. 2431. Rule 801(a)(1) of the Rhode Island Rules of Evidence defines a "statement" as "an oral or written assertion." In *Williamson,* 512 U.S. at 599, 114 S.Ct. 2431, the Supreme Court entertained two meanings of the term "statement." The first definition of the term that it considered was "a report or narrative," Webster's Third New International Dictionary 2229, defn. 2(a), (1961), which the Supreme Court stated "connotes an extended declaration." *Williamson,* 512 U.S. at 599, 114 S.Ct. 2431. According to the Supreme Court, "[u]nder this reading, [the] entire confession—even if it contains both self-inculpatory and non-self-inculpatory parts—would be admissible so long as in the aggregate the confession sufficiently inculpates [the declarant]." *Id.* The Supreme Court then contemplated the alternative definition: "a single declaration or remark," Webster's Third New International Dictionary 2229, defn. 2(b), which the Supreme Court stated "would make Rule 804(b)(3) cover only those declarations or remarks within the confession that are individually self-inculpatory." *Williamson,* 512 U.S. at 599, 114 S.Ct. 2431.

The Supreme Court determined that the narrower definition was most congruent with the meaning of "statement" in relation to Rule 804(b)(3), and it explained that:

"Although the text of the Rule does not directly resolve the matter, the principle behind the Rule, so far as it is discernible from the text, points clearly to the narrower reading. Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory state-

ments unless they believe them to be true. This notion simply does not extend to the broader definition of 'statement.' The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Williamson*, 512 U.S. at 599–600 [114 S.Ct. 2431].

Moreover, the Supreme Court stated that there was "[n]othing in the text of Rule 804(b)(3) or the general theory of the hearsay [r]ules" that can be read to "suggest[ ] that admissibility should turn on whether a statement is collateral to a self-inculpatory statement." *Id.* at 600, 114 S.Ct. 2431. The Supreme Court further stated that, although a self-inculpatory statement is generally more reliable, the mere fact "that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Id.*

The defendant, however, urges this Court to adopt a view counter to the *Williamson* rule, and she offers the viewpoint, as stated in 5 John H. Wigmore, *Evidence in Trials at Common Law*, § 1465 at 339 (Chadbourn rev. ed.1974), that a "statement may be accepted, not merely as to the specific fact against interest, but also as to every fact contained in the same statement." (Emphasis omitted.) Justice Kennedy, in his *Williamson* concurrence, explained that, "[a]ccording to Wigmore, because 'the statement is made under circumstances fairly indicating the declarant's sincerity and accuracy,' the entire state-

ment should be admitted." *Williamson*, 512 U.S. at 612, 114 S.Ct. 2431 (Kennedy, J., concurring in the judgment) (quoting 5 John H. Wigmore, *Evidence in Trials at Common Law*, § 1465 at 271 (3d ed.1940)).

The defendant also cites to McCormick's treatise on evidence as support for her proposition that we should adopt a "rule of completeness" in our Rule 804(b)(3) analysis. *See* 1 *McCormick on Evidence*, § 56 at 283–88, 284 (Kenneth S. Broun, 6th ed.2006). Justice Kennedy, in his *Williamson* concurrence, also addresses McCormick's viewpoint and explains: "Dean McCormick's approach regarding collateral statements was more guarded [than that of Dean Wigmore]. He argued for the admissibility of collateral statements of a neutral character, and for the exclusion of collateral statements of a self-serving character." *Williamson*, 512 U.S. at 612, 114 S.Ct. 2431 (Kennedy, J., concurring in the judgment).

■ Our Rule 804(b)(3) is identical to its federal counterpart. *See* Rule 804(b)(3) Advisory Committee's Note ("The proposed rule is the federal rule"); *Pacheco*, 763 A.2d at 977–78 (stating that the Rhode Island version of Rule 804(b)(3) is "identical to the Federal Rule"). Because of the closeness between the two evidentiary rules, we find the analysis of the majority opinion in *Williamson* concerning what is considered a statement under Rule 804(b)(3) to be persuasive.[15] As such, we hold that a "statement" under Rule 804(b)(3) pertains to the individual declarations provided within a longer narrative.

■ As such, in this case, we are satisfied that the trial justice appropriately exercised his discretion to exclude the six

---

**15.** We recognize that "we are not bound by the United States Supreme Court's interpretation of its rules of evidence," but note that we find its analysis persuasive in light of the fact that "our rules closely hew to their Federal counterpart." *State v. Rodriguez*, 996 A.2d 145, 151 n. 9 (R.I.2010).

excerpts contested by defendant. Although arguably some of the redacted portions of the interview tend to exculpate defendant, none can be said to expose Delestre to criminal liability. As such, they were not properly admissible under Rule 804(b)(3).

## B

### Rule 106

■ Although defendant seemingly suggests that our own Rule 106[16] supports her contention that a "rule of completeness" should be adopted in the case at bar, we find her argument unprofitable. This Court, in *State v. Gasparico*, 694 A.2d 1204, 1210 (R.I.1997), held that "Rule 106 is not available to the person introducing the [statement] in the first instance." The defendant argues that her case is distinguishable from *Gasparico* because "[t]he statement that was introduced in the trial of this matter was made by a co[conspirator], not a witness." We find defendant's attempt to differentiate her case from *Gasparico* fruitless on this issue because Rule 106 does not hinge upon who made the statement, but rather, upon which party is attempting to introduce it. The defendant was the party seeking to introduce Delestre's statement and, as such, Rule 106 was not available to her.

## C

### Motion for a New Trial

■ The defendant also argues that the trial justice erred in denying her motion for a new trial because of the "numerous inconsistencies" within Kayla's testimony.[17] When deciding a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Vargas*, 21 A.3d 347, 354 (R.I.2011) (quoting *State v. Prout*, 996 A.2d 641, 645 (R.I.2010)). In this determination, the trial justice must "consider the evidence in light of the jury charge," then "independently assess the credibility of the witnesses and the weight of the evidence," and also ultimately "determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *Prout*, 996 A.2d at 645). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *State v. Cipriano*, 21 A.3d 408, 429 (R.I.2011) (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008)). Only when "the trial justice does not agree with the jury's verdict, [must he or she] 'embark on a fourth analytical step.'" *Vargas*, 21 A.3d at 354 (quoting *State v. Guerra*, 12 A.3d 759, 765 (R.I.2011)).

■ Because a trial justice, when deciding a motion for a new trial, "is in an especially good position to evaluate the facts and to judge the credibility of the

---

16. Rule 106 of the Rhode Island Rules of Evidence expresses that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

17. The defendant also argues that, had "all of * * * Delestre's taped [interview]" been admitted as evidence, it would have "clearly rais[ed] a reasonable conclusion for a thirteenth juror to conclude * * * that the fall down the stairs led to the injuries described by the medical examiner." Based on our decision that the trial justice did not err in redacting the six excerpts from Delestre's interview, we find defendant's argument as to this issue unavailing.

witnesses," on appeal, this Court's review is deferential. *Vargas*, 21 A.3d at 354 (quoting *Guerra*, 12 A.3d at 766). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Cipriano*, 21 A.3d at 429.

 Here, after the trial justice conducted a thorough review of the testimony elicited at the trial in light of his charge to the jury, he concluded that the jury's verdict "was most appropriate with the facts as presented to them." The trial justice stated: "I think they looked at [defendant's] conduct, looked at the reckless behavior that she exhibited that evening, concluding there certainly was the necessary malice aforethought so that she could be found guilty of murder." He indicated: "I listened to the testimony presented and there is no question in my mind that Kayla was being truthful" and that "her testimony was so consistent [with the other testimony and evidence presented at trial]." The trial justice further pointed out that:

"Those pattern marks [on TJ's face], which [were] described by the medical examiner, * * * was a handprint on that child's face coming from a woman who weighs 175 pounds, on the face of a 32 pound child; and the child was dragged around, slapped, head hitting the floor, yanked across the room, head hitting the door; and then, perhaps, the ultimate blow, or certainly one of the ultimate blows, Delestre * * * comes forward and he finishes up to assist this enraged woman, tosses the child across the room and we heard how he landed. Again, they don't have to be * * * rocket scientist[s] to figure that that was probably how the child's femur was broken."

In conclusion, the trial justice declared:

"The jury got this case. They were told what [its] role was. [The jurors] listened to the witnesses. They found the [s]tate's witnesses credible, as I do, and I believe they found * * * defendant incredible in her testimony. I think they clearly accepted the medical testimony that was presented, and I think they carefully reviewed and understood the law as I gave it to them. The conclusion that they made was one that I would have made, that there was certainly enough malice here to be the equivalent of at least second-degree murder."

After a careful review of the trial justice's ruling, we are satisfied that he performed the correct analysis in deciding the defendant's motion for a new trial and that, in so doing, he did not overlook or misconceive the material evidence. The trial justice adequately articulated his reasoning for denying the defendant's motion, sufficiently summarized the evidence presented at trial, and determined that the testimony of Kayla, the medical examiners, doctors, and police officers were credible, and that the defendant's testimony was not. As such, we are of the opinion that the trial justice's determinations in this case were not clearly erroneous.

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case shall be remanded to that court.

Justice INDEGLIA did not participate.