**Supreme Court**

No. 2012-253-C.A.
(P2/11-950AG)

State                                    :

    v.                                   :

Jaylon Baker.                            :


NOTICE:    This opinion is subject to formal revision before
publication in the Rhode Island Reporter. Readers are requested to
notify the Opinion Analyst, Supreme Court of Rhode Island, 250
Benefit Street, Providence, Rhode Island 02903, at Telephone 222-
3258 of any typographical or other formal errors in order that
corrections may be made before the opinion is published.

State                              :

v.                                 :

Jaylon Baker.                      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The defendant, Jaylon Baker, appeals from a Superior Court judgment of conviction.  After a four-day trial, a jury found Baker guilty of assault with a dangerous weapon, carrying a pistol without a license, and using a firearm while committing a crime of violence.  The trial justice's denial of the defendant's motion for a new trial provides the sole predicate of the appeal.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

After voluntarily waiving the jurisdiction of the Family Court,[1] defendant was charged by information with: assault with a dangerous weapon in violation of G.L. 1956 § 11-5-2 (count 1); obliterating or removing the mark of identification upon a firearm in violation of G.L. 1956 § 11-47-24 (count 2)[2]; carrying a handgun without a license in violation of § 11-47-8(a) (count 3); and

---

[1] The defendant was seventeen years old on the date of the charged offenses.  He voluntarily waived jurisdiction in the Family Court and was tried in Superior Court as an adult.

[2] Prior to trial, the state dismissed count 2 pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

using a firearm while committing a crime of violence in violation of § 11-47-3.2(a)(1) (count 4).[3] The charges stemmed from defendant's encounter with Ptlm. David Allen of the Providence Police Department's violent-crime task force on July 17, 2010. The defendant and Ptlm. Allen were involved in a foot chase across several streets in the South Side of Providence, which culminated in Ptlm. Allen shooting defendant in his right arm and then apprehending him. After a jury trial in Superior Court, defendant was convicted on February 13, 2012 on counts 1, 3, and 4. Five witnesses testified for the prosecution, and three testified for the defense. The parties stipulated to the fact that defendant did not have a duly issued license or permit to carry a firearm. The various witnesses provided conflicting accounts of the events that occurred on July 17, 2010.

**Patrolman David Allen**

Patrolman Allen testified that on July 17, 2010, he was assigned to the Providence Police Department's violent-crime task force. Patrolman Allen testified that at or around 5:30 p.m., he was on patrol in an unmarked police vehicle on Comstock Avenue in Providence. He slowed down to drive over a speed bump and observed "a couple of black males" walking out from an alleyway between two buildings located at 94 and 98 Comstock Avenue. According to Ptlm. Allen, the two men stopped abruptly when they saw him and appeared startled. Patrolman Allen testified that he stopped his vehicle, attempted to engage the two men in conversation, and asked for their names. One of the men responded "Jaylon Baker," and at trial Ptlm. Allen identified this man as defendant. According to Ptlm. Allen, the other man said something inaudible and

---

[3] The original information charged defendant with "use and discharge [of] a firearm" in violation of G.L. 1956 § 11-47-3.2(b)(1). The information was amended by agreement of the parties to eliminate the words "and discharge," and to change the applicable subsection of the statute to § 11-47-3.2(a)(1). The verdict form listed this charge as "using a firearm while committing a crime of violence," while the judgment of conviction retained the word "discharge."

positioned himself behind defendant. Patrolman Allen asked the men where they were headed, and the man standing behind defendant backed toward the alleyway and then began running while reaching toward the waistband of his pants. Patrolman Allen testified that defendant then backed up as well and began running in the same direction, while grabbing at what "appeared to be a large, heavy object" on the right side of his waistband.

Patrolman Allen testified that, when defendant started moving backwards, Ptlm. Allen got out of his vehicle, at which point defendant, and then Ptlm. Allen, began to run. Patrolman Allen chased the two men into the alleyway, and he testified that he observed each of them holding a firearm. Patrolman Allen then drew his department-issued service weapon, a .40-caliber Beretta, and yelled, "Police. Drop the gun. Police. Stop." Patrolman Allen testified that he also attempted to use his radio to dispatch his location, but was unsuccessful because someone else was already speaking on the same channel. Patrolman Allen continued to chase the two men through an open gate and into the backyard of 35 Harvard Avenue, at which point he lost sight of the second man, who was running ahead of defendant.

Patrolman Allen testified that defendant was holding a Ruger .22-caliber target pistol, which is distinctive looking because it has a "large thick barrel, and * * * a kind of funny-looking handle and a large front sight." The defendant continued to run and turned to the left, and Ptlm. Allen pursued him, while yelling for defendant to stop and drop the gun. Patrolman Allen testified that when he reached the front of 35 Harvard Avenue, defendant was already across the street in front of 40 Harvard Avenue, at which point Ptlm. Allen observed defendant turn around, hold his firearm with two hands, and point it at Ptlm. Allen. Patrolman Allen then raised his own gun and fired one round at defendant, from approximately fifty feet away, while

still running toward defendant at a sprint. Patrolman Allen testified that defendant turned and continued to run into an alleyway adjacent to 40 Harvard Avenue.

Patrolman Allen testified that when defendant reached the border between the backyards of 40 Harvard Avenue and 43 Wesleyan Avenue, he was confronted with two fences that were roughly one or two feet apart. According to Ptlm. Allen, defendant stopped, turned around, and pointed his gun at Ptlm. Allen for a second time. Patrolman Allen was then able to broadcast over his radio that shots had been fired. Patrolman Allen fired his gun three more times, aiming at defendant, while still running toward defendant from the alleyway adjacent to 40 Harvard Avenue. Patrolman Allen testified that he saw defendant jump over the two fences that separated the backyards of 40 Harvard Avenue and 43 Wesleyan Avenue, at which point he noticed that defendant was no longer holding a gun. Patrolman Allen then re-holstered his own weapon, jumped over the same two fences, and saw that defendant had become caught on a third fence that separated 43 and 35 Wesleyan Avenue, which defendant had attempted to jump. Patrolman Allen approached defendant and patted him down. Patrolman Allen testified that "[s]ome part of the clothing -- I think it was his pant leg or shoelace or something -- was tied up, and he was hung up on the fence." Patrolman Allen testified that he did not see defendant drop his firearm. Patrolman Allen also testified that he was running at full speed during the course of the pursuit, and that he did not stop to speak with anyone during this time.

After Ptlm. Allen secured defendant, he retraced his steps in search of defendant's firearm. Patrolman Allen located a large, dark pistol in the backyard of 40 Harvard Avenue, where he had last seen defendant holding a gun. Patrolman Allen identified the weapon as the same Ruger .22-caliber pistol that he saw defendant holding during the chase. Patrolman Allen

testified that defendant was then transported to a hospital for treatment of a gunshot wound to his right arm.

**Detective Paul Romano**

Detective Romano, who was assigned to the Providence Police Department's Bureau of Criminal Identification (BCI), processed the scene of the foot chase and shooting on July 17, 2010. Detective Romano photographed three .40-caliber shell casings in the vicinity of 40 Harvard Avenue, as well as a "Ruger Mark I .22 caliber semiautomatic" firearm located in the backyard of 40 Harvard Avenue. The firearm was loaded, with seven rounds in the magazine and one in the chamber. Detective Romano testified that no latent fingerprints were recovered on this firearm, and its serial number had been obliterated. Detective Romano testified that he test-fired the firearm and found it to be functioning properly. Detective Romano also testified that a suspected .40-caliber projectile hole was discovered in the rear door of 43 Wesleyan Avenue. Detective Romano stated that no .22-caliber shell casings were found at the scene.

**Detective Ralph Constantino**

Detective Constantino was assigned to the Providence Police Department's BCI, and he also responded to and processed the scene of the foot chase and shooting on July 17, 2010. Detective Constantino testified that a projectile was recovered from inside the house at 43 Wesleyan Avenue, but he could not identify what sort of firearm the projectile came from. Detective Constantino examined the hole in the back door of 43 Wesleyan Avenue with a probe and determined that the trajectory of the bullet was "slightly up from back to front, and it was pretty straight on, straight through the door." Detective Constantino explained that this trajectory indicated that the bullet "was traveling in an upward direction, as opposed to flat or

horizontal," when it struck the door. Detective Constantino also testified that the yard behind 40 Harvard Avenue was slightly lower than the rear portion of 43 Wesleyan Avenue.

## Javon Parrott

Parrott, a close friend of defendant, testified for the state. Parrott testified that he was with defendant approximately twenty or thirty minutes before defendant encountered Ptlm. Allen. Parrott stated that, shortly after he and defendant parted, he saw defendant running toward Harvard Avenue from Comstock Avenue, and he saw a police officer drawing a gun. Parrott testified that he heard the officer say, "Stop. Or I'm going to shoot," and he saw the officer fire his gun. Parrott testified that defendant "had something in his hand," but he stated that this object was not a gun. In contrast to this testimony, the state introduced an audio recording of an interview of Parrott conducted by the Providence police on July 17, 2010, a few hours after the foot chase and shooting. The recording captured approximately the last five minutes of an interview which, according to Parrott, lasted for roughly one hour and forty minutes. A transcript of this recording was also admitted into evidence. The transcript contained the following statement made by Parrott:

> "Before I split up with my cousin,[4] [defendant], I was, we was walking down Broad. We were, he met up with this friend, I met up with my girl. At least, 20…10 minutes later, he comes running out of the um, side street in Harvard and Comstock with a gun in his hand. The cops is chasing him. Another suspect ran in the other direction. Cop keeps, um, running after my boy with his gun pointed out saying, 'If you don't drop the gun, I'm gonna shoot.' My cousin, [defendant], he ran in the backyard. The detective ran right behind him and then they started firing shots. After that, after the backyard I didn't, I didn't see what was done. All I saw was what I heard."

---

[4] Parrott testified that he and defendant are not related.

Later in the interview, when asked where the gun was, Parrott said, "I saw him shuffling it in his hands." According to Parrott, he initially told the interviewers that he had not seen defendant holding a gun, and then later changed his answer after the interviewers asked him the same question "[a]bout like 50 times." Parrott testified that he was "in shock" at the time because he had been shot the year before, that he was nervous and crying, and that the officers would not let his mother into the interview room.[5] Parrott also admitted, however, that he had previously told his girlfriend that, if he had to testify in court, he would lie for defendant.

### Detective William Brown

The state also called Det. Brown, a detective in the Youth Services Bureau of the Providence Police Department, who was one of the officers who interviewed Parrott on July 17, 2010. Detective Brown testified that he and Sgt. Marsland interviewed Parrott for "five or ten minutes" prior to when they began recording. Detective Brown further testified that Parrott was not crying and did not ask to call his mother at any point during the interview.

### Vanessa Kilgore

The defense called Vanessa Gail Kilgore, who was living at 41 Harvard Avenue on July 17, 2010. Kilgore testified that she was exiting a vehicle in front of 41 Harvard Avenue, preparing to pick up her elderly mother, when she "noticed a police officer was on [Harvard Avenue] chasing the kids," and the officer was holding a gun. According to Kilgore, there were many children on the street at the time, and "[t]hey went to the left and to the right." Kilgore testified that she approached the officer, and the following interaction occurred:

> "I asked him to stop what he was doing. And um, what was he doing, don't be doing this in front of my mother, to put the gun away. * * * But what he did is he took his gun and he put it down

---

[5] Parrott testified that he was seventeen on July 17, 2010; however, he also testified that his birthday was November 27, 1991, which means he would have been eighteen on that date.

to the side, and he told me to tell the young fellow to stop. And so, what I did is I turned to the kid because the still -- the children -- the young fellows was on the side of me. And so I said, 'Kids, stop[,]' because that's what the police officer had told me to do. And he had his pants rolled up in his pocket, and he just -- time stood still for just one second, and then the police officer picked his gun back up and child decided to run. The police officer told him to stop or I'm going to shoot."

Kilgore testified that she had never met the young man whom she saw running, and she said she did not know what he looked like. Kilgore further testified that she saw the young man run across the street and between two houses and that she did not see him holding a gun. Kilgore also testified that, after checking on her mother, she went across the street and saw that "[t]he young fellow was hanging on the fence."

**The Defendant**

The defendant testified that on July 17, 2010, he was walking with a friend toward a recreation center to play basketball, and they used a shortcut called a "cut-through" between Harvard Avenue and Comstock Avenue. The defendant testified that, as he exited the cut-through, he saw an unmarked police vehicle that "kind of passed us a little bit and backed up a little bit and stopped." The defendant testified that the officer opened the door of the vehicle and began asking questions about what he and his friend were doing, where they were going, and whether they had identification. According to defendant, he stated his name and where he lived, but did not provide identification, even though he was carrying it on his person.

The defendant testified to a quick succession of events that followed: immediately after he declined to provide identification, the officer exited his vehicle, then defendant's friend started running away, and then defendant began to run as well. The defendant stated that he bumped into his friend and then a house wall but continued to run across Harvard Avenue, with the officer behind him yelling, "Stop, stop, or I'll shoot. Stop or I'll shoot." The defendant

testified that he jumped over a fence next to a house on Harvard Avenue and heard the officer say, "Stop or I'll shoot," and then he felt that he had been shot in his right arm. He testified that he kept running, tried to jump over another fence, and then his arm "gave out." He stated that he was wearing jean shorts that became caught in the fence. The defendant testified that Ptlm. Allen approached him while he was caught on the fence and asked him, "Where's the gun? Where's the gun?" to which defendant responded, "Officer, I don't know what you're talking about. I don't have a gun. Can you please get me off the fence. You just shot me." The defendant testified that he did not stop or turn to face Ptlm. Allen at any point during the chase.

### James Farrell

The defense also called James Farrell, who was living at 53 Wesleyan Avenue on July 17, 2010. Farrell testified that on that day he was bicycling to his house and stopped on Comstock Avenue to speak to a neighbor. Farrell testified that, while he was stopped on Comstock Avenue, he saw an "unmarked cruiser pull up in front of two teen-age boys" who were standing on the sidewalk. According to Farrell, the officer "summoned" the boys, and then the boys both produced their wallets. Farrell testified that the boys then started running, and the officer jumped out of his car and pursued them. Farrell stated that he did not see either of the boys put their hands to their waistbands, nor did he see them touching anything resembling large, heavy objects.

### II

### Motion for a New Trial

After the jury returned a verdict of guilty on all three counts, defendant filed a motion for a new trial. The defendant argued that Ptlm. Allen's testimony should have been discredited because he could not have failed to see defendant throw the gun from where defendant was

caught on the third fence to where the gun was found, several feet away. The defendant further argued that Ptlm. Allen's account of the chase was not accurate because defendant could not have jumped over a high fence, or set of fences, after being shot in the arm. Finally, defendant argued that Ptlm. Allen's testimony was inconsistent with Det. Constantino's testimony regarding the trajectory angle of the bullet hole in the back door of 43 Wesleyan Avenue.

The state countered that the court should accept Ptlm. Allen's testimony because it was credible and supported by the physical evidence. The state further argued that the court should accept Parrott's statement from July 17, 2010, rather than his testimony at trial, regarding the issue of whether he saw defendant holding a gun, because Parrott was defendant's close friend and had previously told his girlfriend that he would lie for defendant. The state further argued that the court should accept the testimonies of Det. Constantino and Det. Romano regarding the physical evidence at the scene. The state asserted that the court should discredit the testimonies of Kilgore and Farrell, because both witnesses presented inconsistent and unreliable versions of the facts. Finally, the state argued that the court should discredit defendant's version of the events because there was no physical evidence to support his claims, and because he never denied carrying a gun while Ptlm. Allen was chasing him.

On March 30, 2012, the trial justice denied the motion, and on May 17, 2012, he sentenced defendant to a term of twenty years to serve at the Adult Correctional Institutions on the felony assault charge (count 1), and ten years suspended, with probation, on counts 3 and 4, all such terms to be served consecutively. The defendant timely filed a notice of appeal, claiming as reversible error the trial justice's denial of his motion for a new trial.

## III

## Standard of Review

"When deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. LaPierre, 57 A.3d 305, 310 (R.I. 2012) (quoting State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012)). "In this determination, the trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Bunnell, 47 A.3d at 232). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Bunnell, 47 A.3d at 232). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting Bunnell, 47 A.3d at 232).

"Because a trial justice, when deciding a motion for a new trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses, on appeal, this Court's review is deferential." LaPierre, 57 A.3d at 310 (quoting Bunnell, 47 A.3d at 232-33). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Bunnell, 47 A.3d at 233).

# IV

## Discussion

On appeal, defendant argues that the trial justice overlooked and misconceived material evidence when denying his motion for a new trial. Specifically, defendant argues that the trial justice erred by accepting Ptlm. Allen's testimony over all evidence to the contrary. The defendant asserts that Ptlm. Allen's testimony was not credible and not supported by the physical evidence. In particular, defendant argues that it would have been impossible for Ptlm. Allen not to see defendant throw his gun before scaling the fence upon which he ultimately became caught, because Ptlm. Allen was looking and shooting at defendant during this time. The defendant also asserts that, if Ptlm. Allen had shot defendant when he claimed he did, it would mean that defendant vaulted over two high fences into the yard of 43 Wesleyan Avenue immediately after sustaining a gunshot wound to his arm, before becoming caught on a third, lower fence.[6] The defendant further argues that, while Ptlm. Allen testified that he fired his gun straight ahead from the alleyway adjacent to 40 Harvard Avenue into the yard of 43 Wesleyan Avenue, the bullet that penetrated the back door of 43 Wesleyan Avenue was actually further off to the right.

The defendant also asserts that Ptlm. Allen had a motive to lie in order to protect himself from the potential consequences of an unreasonable civilian shooting incident. The defendant suggests that the gun attributed to defendant may have been a "throwaway gun," planted by Ptlm. Allen for the purpose of defending against a claim of excessive force, or a "community gun," placed in a public area for use by more than one person. Finally, defendant notes that the

---

[6] The record does not clearly indicate the height of any of the fences involved in this case. Neither defendant nor Ptlm. Allen testified to the height of the first fence (or set of fences) that defendant jumped over, nor did they testify to the height of the fence upon which defendant became caught. Three photographs of the fences were introduced as trial exhibits, but they do little to indicate comparative height. Before the commencement of testimony, however, the jury was transported to the scene of the charged offenses for a view.

jury struggled with the issue of whether defendant pointed a firearm at Ptlm. Allen, as evidenced by the content of jury questions submitted to the trial court during deliberations.

The state argues that the physical evidence was consistent with Ptlm. Allen's testimony. Regarding the bullet fired into the back door of 43 Wesleyan Avenue, the state notes that Ptlm. Allen testified that he fired only the first of three consecutive shots from the alleyway, because he was firing his gun as he ran toward defendant. The state also asserts that, if Ptlm. Allen had lied about defendant having a gun, he would also have lied by testifying that he saw defendant throw or drop the gun, instead of stating that he did not see this action occur. The state further argues that the jurors had adequate information to judge whether defendant would have been able to scale the two fences at 43 Wesleyan Avenue after having been shot in the arm, because the jurors went on a view of the area before the trial began, and photographs of the scene were admitted into evidence. Finally, the state argues that defendant became caught on the third, lower fence because of his clothing, not because of the injury to his arm.

In his bench decision denying defendant's motion, the trial justice first addressed the inconsistency between Parrott's testimony at trial and the statement he made to the police on July 17, 2010, ultimately determining that the jury could decide which portions of Parrott's accounts to accept and which portions to reject. The court characterized Kilgore's testimony as confusing and "of no particular moment," largely because he doubted that Kilgore had had a conversation with Ptlm. Allen during the time when he was actively chasing defendant. The court found that Farrell's testimony was similarly of no significance, because Farrell stated that defendant produced his wallet upon Ptlm. Allen's demand for identification, an action that both Ptlm. Allen and defendant denied.

- 13 -

As the trial justice explained, this case ultimately turned on whether the jury accepted the defendant's or Ptlm. Allen's version of the facts. The trial justice found that Ptlm. Allen's version of events was supported by the statement that Parrott made during his interview with the police. Further, the trial justice noted that "at no time was [the defendant] ever asked by counsel, nor did he flatly ever deny carrying the gun during the chase. And at no time was he asked by counsel, nor did he ever flatly deny that he had pointed the gun at Patrolman Allen." The defendant did testify that, when he was ultimately apprehended, he told Ptlm. Allen that he did not have a gun; however, the trial justice found that this statement was consistent with both Ptlm. Allen's and the defendant's versions of the events, because the defendant would have already tossed the gun aside by the time he made this statement to Ptlm. Allen. Thus, after reviewing and weighing the evidence presented, the trial justice found that the jury was "well-warranted" in crediting Ptlm. Allen's testimony, discrediting the defendant's testimony, and finding the defendant guilty. We are satisfied that the trial justice articulated adequate grounds for denying the defendant's motion and did not overlook or misconceive material evidence when making his decision.

## V

## Conclusion

For the reasons stated herein, we affirm the judgment of conviction. The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**          State v. Jaylon Baker.

**CASE NO:**          No. 2012-253-C.A.
                              (P2/11-950AG)

**COURT:**          Supreme Court

**DATE OPINION FILED:**   December 5, 2013

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                              Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                              For State:  Virginia M. McGinn
                                          Department of Attorney General

                              For Defendant:  Kara J. Maguire
                                          Office of the Public Defender