**Supreme Court**

No. 2010-341-C.A.
(P1/08-9A)

State                    :

   v.                    :

James LaPierre.              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

James LaPierre.                :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The defendant, James LaPierre,[1] appeals from a judgment of conviction of three counts of first-degree child molestation and three counts of second-degree child molestation.  On appeal, the defendant contends that the trial justice's denial of his motion for a new trial was clearly erroneous because the jury's verdict was against the weight of the evidence and failed to do substantial justice.  Specifically, he argues that the testimony of the complaining witness was "so characterized by vagueness, illogic, inconsistency, and lack of recall that she was simply incredible."  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

The defendant met the complaining witness's mother, Susan,[2] around March 1996, and the two began dating shortly thereafter.  At some point during the summer of that same year,

---

[1] The defendant legally changed his name to Miguel Monti in 1991.  Because defendant's name, however, is listed as James LaPierre in the case name and Superior Court documents, we shall refer to him as James LaPierre.

[2] Because the complainant was a minor child at the time these incidents were reported, we shall use pseudonyms for her and her immediate family members and any person who was under the age of eighteen at the time to protect their privacy.

Susan introduced her three children to defendant. Jane, the complaining witness in this case, was the oldest of the three and the only girl. At that time, Jane was seven years old and the family lived at an apartment located on Atwells Avenue in the City of Providence. Eventually, defendant began babysitting Susan's children while she was working. In the fall of 1997, after becoming pregnant with defendant's child, Susan and her children moved to Palfrey Place in Providence, at which time Jane was approximately eight years old. After the couple's baby was born, Susan returned to work and defendant resumed babysitting on those nights.

At trial, Susan testified that when Jane was either eight or nine years old, Jane informed her that defendant had "touched her butt."[3] Susan further testified that she confronted defendant about her daughter's comment, and he denied it. Later that day or the next day, Jane expressed to her mother that she had lied and that the alleged touching had not occurred. Jane testified at trial that between the initial disclosure to her mother and her subsequent recantation, she had spoken with defendant and he had "asked [her] not to tell her [mother]" or he would "[d]rag [them] through the mud." Jane testified that defendant's threat scared her, so she went back and told her mom that it never happened. Susan attested that, after her daughter's revelation, she "watch[ed] for little thing[s]," but admitted that there were a number of times that she allowed her daughter to be alone with defendant notwithstanding the disclosure and her concerns that arose from it.

In October 2000, defendant and Susan ended their dating relationship, but defendant continued to see their son on a daily basis. The next month, defendant began dating Kelly, a friend of Susan's, with whom he later cohabitated.[4] In February 2005, however, defendant

---

[3] During a grand jury proceeding held in 2005, Susan testified that Jane was either five or six years old at the time of this disclosure.

[4] Kelly had a daughter who also lived with them.

moved out of Kelly's residence to Aqueduct Road in the City of Cranston. The defendant continued to provide care for his son five days per week, so he discussed his need for a babysitter during those times with Susan, and she suggested that Jane babysit. The defendant testified that Jane babysat at his house "roughly" twenty-five to thirty times between February and April of 2005, and that she would sleep over on the nights she was there.

When Jane was in seventh grade, she became best friends with her classmate, Andrea.[5] Jane testified that she told Andrea about what defendant did with her when she was younger after finding Andrea "in the science room on the floor crying."[6] Jane stated:

> "I had asked [Andrea] what was wrong, and she kind of like lashed out on me and said that I wouldn't understand. I asked her to tell me and maybe I could [understand,] and she told me, and when she told me I confided to her because I did understand, and I * * * did know how to give some type of advice to kind of help her calm down."

Jane further testified that Andrea was the only person she told about what defendant "had done to [her]" because she "didn't want anybody to judge [her]."

On April 28, 2005, Jane attended a Thursday night youth-group church event held in Cranston with Andrea. She was supposed to babysit at defendant's house that night, so she asked the church's bus driver to drop her off at Aqueduct Road rather than at her own address. According to Jane, when she arrived at defendant's apartment, defendant asked her whether she needed pajamas and, after she responded affirmatively, requested that she change in front of

---

[5] Andrea, however, testified that she met Jane in the eighth grade.
[6] Although Jane alluded to her discussions about "what had happened with [defendant]" being sexual in nature, Andrea testified that the subject matter about these "private conversation[s]" with Jane was, in fact, sexual.

him.[7] Jane testified that she rejected his solicitation, and defendant asked her "[w]hy not?" Jane stated, however, that his questioning was interrupted by the home telephone ringing.[8]

According to Jane, she answered the telephone and heard the "bus monitor" yelling, "[i]s [defendant] touching [you], is he raping [you], is anything wrong?"[9] Jane testified that the "bus monitor" also stated that "they were on their way back," so she told defendant that she forgot her bag on the bus and, subsequently, "ran out of the house."[10] Jane further averred that by the time she got outside, the school bus already had returned and the police had arrived. The defendant testified that after he left his apartment, he saw "a very large amount of kids outside" who were making "a lot of noise and ruckus." He stated that he heard them shouting, "That's the one who raped her" and that they started running toward him. In response to this situation, defendant testified that he got into his truck and drove away. The defendant attested that he called his home telephone, that Jane answered it, and that she told him that she did not tell anyone that he had raped her, but stated that Andrea "had said something to the people on the bus."

A female officer questioned Jane, asking "[i]f what everyone was saying was the truth." Jane testified that, at first, she told the officer that the allegations were a lie and that defendant had not done anything to her; but, after being told by the officer that she would get into trouble if

---

[7] The defendant denied that this conversation occurred and testified that their discussion revolved around why she was so late getting to his apartment as well as babysitting instructions.

[8] The defendant asserted that "the [tele]phone never rang in the house."

[9] Although Jane testified that it was the "bus monitor" who called her, both the bus driver and Andrea testified that the bus driver was the only adult on the bus that night.

[10] According to the bus driver, Jane had asked that night if she could be the last kid to get dropped off; and, when he denied her request, "[s]he was a little upset." Subsequently, after leaving defendant's address, the bus driver testified that he "hear[d] the buzzer to the door go off and all of the kids started jumping out of the back door of the bus." Based on information provided to him by Andrea, the bus driver returned to defendant's address.

she was lying, Jane admitted "the truth."[11]   Jane then was brought to the Cranston police department and later was joined by her mother.  After leaving the police station, Susan and Jane both spoke with defendant on the telephone.  According to Jane, when defendant spoke with her, "[h]e was begging [her] to say that there was no penetration."  She testified that defendant was crying and that there were loud noises, similar to "water crashing," that she could hear in the background.  Susan testified that defendant said to her that "he was a monster, and he was sorry" during this telephone conversation.[12]

Kelly likewise testified that she spoke with defendant that night, asserting that "[h]e was hysterical" and crying during their conversation and that he said to her "that there was an incident where he * * * put baby powder on [Jane] * * * [but] that if he did something to her, he doesn't remember."  Kelly further testified that defendant said that he was in a hotel "on the run" and that he wanted to kill himself.  She stated that he continuously referred to himself as a "monster," while exclaiming that "he couldn't believe what he had done and that he felt bad and that he was sorry."

A grand jury indicted defendant on four counts of first-degree child molestation, and he was arrested on May 24, 2005.  As the prosecutor was preparing Jane for her testimony on the eve of the trial, however, "other instances of alleged criminality were uncovered,"[13] and, as a

---

[11] It is unclear from the record what Jane originally told the police about what had happened between her and defendant; however, defendant subsequently was charged with four separate counts of first-degree child molestation under G.L. 1956 § 11-37-8.1 ("A person is guilty of first degree child molestation sexual assault if he or she engages in sexual penetration with a person fourteen (14) years of age or under.").

[12] This information was not, however, provided by Susan to the police within her initial statement, her later statement to the Providence police, or her 2005 grand jury testimony.

[13] During the motion for the new trial, defendant argued that it was at this time that Jane "change[d] the place, change[d] the dates and change[d] the substance of her testimony," instead alleging "that not only were there activities occurring on the couch at Palfrey Place, but there was also penetration, vaginal intercourse and * * * anal intercourse."

result, the charges against defendant were dismissed under Rule 48(a) of the Superior Court Rules of Criminal Procedure. Thereafter, on January 2, 2008, a second grand jury indicted defendant on a total of six counts of child molestation, three of which were first-degree charges and three of which were second-degree charges.[14] A trial was held in February 2010.

At the trial, Jane testified that, after her family moved to Palfrey Place, defendant would babysit her and her two younger brothers approximately five or six nights out of the week while her mother worked. She recalled one particular night that defendant was babysitting, when, after sending her brothers to bed, defendant asked her to lie down on the couch with him, which she did. Jane stated that they were positioned with "[h]is back * * * against the couch and [her] back * * * against his chest," and that this was the first time they had ever done this.[15] According to Jane, defendant then asked her "to play a game," which eventually resulted in digital, vaginal penetration. She further testified that defendant told her to go to her mother's bedroom where defendant performed cunnilingus on her. Jane stated that defendant would engage in "different

---

[14] The six counts that defendant was indicted for included the engagement, with a person under the age of fourteen, in: (count 1) digital/vaginal penetration, (count 2) hand/inner thigh contact, (count 3) cunnilingus, (count 4) anal intercourse, (count 5) hand/buttocks contact, and (count 6) hand/penile contact.

[15] As will be discussed infra, at the first grand jury hearing, Jane testified that she was six years old and was living at the Atwells Avenue apartment when defendant first sexually assaulted her. She further testified at the first grand jury hearing that "it also continued at Palfrey Place," but that "[i]t happened more [at Atwells Avenue] than other places." However, Jane's testimony regarding how old she was changed between the first and second grand jury hearings based on her understanding of which apartment had a particular green rug. As Jane explained at the trial, she had "thought the green rug was in * * * Atwells [Avenue]," which is why she "mist[ook] [her] age." Jane further testified that when she "realized that the green rug was on * * * Palfrey Place[,] [t]hat is how [she] came to the realization that [she] was much older than what [she] had said the first couple of times." When Jane was questioned about how she came to this realization, she testified that she had "asked her [mother] where the green rug was, and [was told] that it was at * * * Palfrey [Place], * * * [and that] it happened the most where the green rug was."

things [during] different time[s]," but that some type of sexual activity would happen "[e]very time [her] mom went to work and he babysat."

Jane additionally testified about another specific instance that took place when she was nine years old. She stated that she had been sleeping in her mother's bed when defendant woke her up by "rubbing baby powder * * * on [her] butt" and proceeded to perform anal intercourse. Although Jane "told him to stop" "[b]ecause it hurt," he did not. Jane attested that she did not tell her mother about this event. The last detailed event Jane testified about was when defendant asked her to "unzip his pants" and "told [her] to touch him," which she did.

According to Jane, when she was fourteen years old, she was walking to a local community pool when defendant stopped as he was driving by and "asked [her] if she wanted a ride." Jane testified that she accepted the ride, but that defendant stopped by his apartment on the way to the pool to use the bathroom. Jane stated that, although she initially remained in the car, after a little while she also went into defendant's apartment. She testified that when she arrived in the apartment, defendant told her that "[h]e wanted to teach [her] how to kiss."[16] She denied his request, and she testified that they went back to the car and he took her to the pool, but that she did not tell her mother about that occurrence.

Andrea testified that on the night of April 28, 2005, after Jane was dropped off from their youth-group church event, she "told the bus driver that [they] had to go back and get [her]" because of "something that [she] had learned during the private discussion [with Jane] and based on the feeling [that Jane] told [her] she was experiencing before [they] dropped her off."

---

[16] Jane provided inconsistent testimony about this incident. At the grand jury proceeding and at trial, Jane testified that she was walking to the Zucollo pool when defendant offered her a ride; however, during cross-examination, she stated that she had made a mistake and that she really had been heading toward the Neutaconkanut pool. Further, Jane testified at the first grand jury proceeding that defendant performed cunnilingus on her after she went upstairs to his apartment; however, at the trial, she attested that he merely told her that he wanted to kiss her.

According to Andrea, after the bus arrived back at defendant's residence, she saw Jane, who seemed "[a]ngry, upset, sad, [and] confused." Jane testified that she was angry at Andrea "[b]ecause she told a secret," and Andrea stated that, "[a]fter the incident [they] actually didn't speak" and that they "haven't talked * * * in years."

After the trial, the jury found defendant guilty on all six counts of child molestation. On May 3, 2010, defendant was sentenced to fifty years to serve at the Adult Correctional Institutions (ACI), with twenty-five years to serve, twenty-five years suspended, with probation, on the three first-degree charges. The defendant also was sentenced to thirty years to serve at the ACI, with fifteen years to serve, fifteen years suspended, with probation, on the three second-degree charges, with all sentences to run concurrently. The defendant appealed his conviction solely based upon the denial of his motion for a new trial.

Further facts will be provided as may be necessary to discuss the issues defendant raised on appeal.

## II

### Standard of Review

"When deciding a motion for a new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012) (quoting State v. Vargas, 21 A.3d 347, 354 (R.I. 2011)). "In this determination, the trial justice must 'consider the evidence in light of the jury charge,' then 'independently assess the credibility of the witnesses and the weight of the evidence,' and also ultimately 'determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting Vargas, 21 A.3d at 354). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the

- 8 -

evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting State v. Cipriano, 21 A.3d 408, 429 (R.I. 2011)). "Only when 'the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step.'" Id. (quoting Vargas, 21 A.3d at 354).

"Because a trial justice, when deciding a motion for a new trial, 'is in an especially good position to evaluate the facts and to judge the credibility of the witnesses,' on appeal, this Court's review is deferential." Bunnell, 47 A.3d at 232-33 (quoting Vargas, 21 A.3d at 354). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. at 233 (quoting Cipriano, 21 A.3d at 429).

### III

### Discussion

On appeal, defendant argues that "the testimony of the complaining witness, [Jane], was so characterized by vagueness, illogic, inconsistency, and lack of recall that she was simply incredible," and as such, "the trial justice overlooked and misconceived the material evidence (which was solely testimonial as no corroborative physical, medical, or forensic evidence was admitted at trial), and failed to draw the appropriate inferences from the evidence adduced."

The defendant points to four main inconsistencies, which he describes as the "circuitous statements of [Jane, which] shaped themselves into a patched-together story that was confusing, complicated, and replete with discrepancies." First, he argues that Jane's initial denial of any inappropriate touching, which defendant contends she manufactured "[o]nly after prodding[,] prompting[,] * * * and * * * inexorable pressure," tends to show her lack of credibility. Second,

defendant proposes that, although originally he was indicted on four counts, when it came to light on the eve of the first trial that Jane "had provided glaringly incorrect time periods for the dates of the alleged assaults," she suddenly "revealed 'new' or 'different' incidents that she had not previously disclosed." Third, defendant criticizes Jane's sudden recognition of a "crucial fact that * * * she had never mentioned during the thirty months the case had been pending": "the existence of a green rug in the apartment where she was assaulted * * * that allowed her to pinpoint the dates of the assaults." Finally, he maintains that Jane's "retelling of the 'pool incident' * * * [makes] little logical sense," both with respect to her confusion between the names of two separate and distinct pools and the "starkly different versions" of events that Jane provided, while under oath, about what happened after she accepted defendant's offer to give her a ride.

The state, quoting State v. Jimenez, 33 A.3d 724 (R.I. 2011), argues that "defendant's contentions [on appeal] lack merit" because "[t]he mere fact that defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." Id. at 738 (quoting State v. Rivera, 987 A.2d 887, 903 (R.I. 2010)). Further, the state contends that the record supports the trial justice's decision to deny defendant's motion for a new trial and that "defendant has not provided even a colorable basis for this Court to disturb the trial justice's ruling."

After a thorough review of the record, it is clear to this Court that defendant's arguments on appeal demonstrate little more than an apparent disagreement with the trial justice's ultimate determination on credibility. The defendant asserts that the trial justice's interpretation about the inconsistencies presented by the state's witnesses was "simply illogical," and that only his own testimony should "be interpreted as * * * credible and logical." In our review of this case,

- 10 -

however, we do not focus on whether this Court simply agrees or disagrees with the trial justice's credibility determinations. Rather, we give great deference to those determinations; and, if the trial justice has stated sufficient grounds for denying a motion for a new trial, we will not overturn that decision unless the trial justice "has overlooked or misconceived material evidence or was otherwise clearly wrong." Bunnell, 47 A.3d at 233 (quoting Cipriano, 21 A.3d at 429).

During the hearing on defendant's motion for a new trial, the trial justice acknowledged that there were, in fact, "material inconsistencies" in Jane's testimony and pointed out the same examples of which defendant now complains on appeal. The trial justice then explained that "the jury heard all of these inconsistencies" and "the explanations as to why these inconsistencies may have been given by the complaining witness in the first instance." He also described possible rationales behind the apparent discrepancies that the jury may have relied upon to "accept[] the fact that most of the allegations that were complained of did, in fact, take place * * *."

The trial justice found all the state's witnesses, including Jane,[17] Susan, and Kelly, to be credible, but he found "defendant's credibility to be highly questionable, * * * if not

---

[17] The trial justice expounded upon his credibility determination, in part, by stating the following:

> "I believe that the child witness, now a 20-year old, I believe she was credible. I believe she was credible in all of her testimony regarding the explicit acts that were complained of by her against the defendant.
> "* * *
> "The [c]ourt believes, under all of the facts and circumstances, that the witnesses presented by the prosecution in this case were credible and particularly the testimony of [Jane] at age 20 with regard to the salient, important facts of these acts occurring was extremely credible."

incredible."[18] Most importantly, in regard to the trial justice's credibility determination of Jane, he asserted that:

> "The [c]ourt having had the benefit of having sat on a lot of cases, sat on a lot more cases than this jury, has a better understanding of what happens when child witnesses are called upon to disclose facts deeply personal in nature, particularly at the tenderest of ages, that it is not unusual that there are often inconsistencies both factual with regard to timelines, with regard to location and our laws allow for that."

The trial justice then aptly considered his charge to the jury, which he stated contained the "usual and ordinary instructions with regard to [child molestation] matters," and stated that he "believe[d] that the jury understood and applied the instructions appropriately." He thoroughly explained that this "certainly was a case upon which reasonable minds could differ. [The jury] could have easily believed the testimony of the defendant in which he denied any inappropriate behavior on the part of himself and her." However, after conducting the appropriate analysis, the trial justice determined "that the jury verdict was wholly substantiated by the evidence," and that he "d[id] not disagree with the jury verdict and would have come to the same conclusion if this wasn't a jury trial."

On appeal, the defendant essentially asks us to second-guess the trial justice's credibility determinations. We have searched the record, however, and we are of the opinion that the trial justice performed an exhaustive review of the testimony presented at trial and thoughtfully evaluated the evidence and the credibility of the witnesses in light of his charge to the jury. The trial justice found the complainant to be a credible witness, and conversely, he rejected the defendant's testimony as incredible. We cannot hold that the trial justice "overlooked or misconceived material evidence or was otherwise clearly wrong." Bunnell, 47 A.3d at 233

---

[18] The trial justice further stated: "The [c]ourt just felt basically that the defendant's testimony in and of itself was patently incredible[,] not forthright and was not truthful."

(quoting Cipriano, 21 A.3d at 429).  Therefore, the trial justice's findings and his conclusions in denying the defendant's motion for a new trial were well within his discretion, and we have no cause to disturb his decision.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record of this case shall be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**   State v. James LaPierre.

**CASE NO:**   No. 2010-341-C.A.
(P1/08-9A)

**COURT:**   Supreme Court

**DATE OPINION FILED:**   December 14, 2012

**JUSTICES:**   Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**   Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

For State:   Lauren S. Zurier
Department of Attorney General

For Defendant:  Lara E. Montecalvo
Office of the Public Defender