**Supreme Court**

No. 2012-3-C.A.
(P1/10-680A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Lakesha Garrett. | : |

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.                      :

Lakesha Garrett.              :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Lakesha Garrett, appeals from a judgment of conviction on one count of voluntary manslaughter.  On appeal, the defendant contends that the trial justice overlooked and misconceived material evidence and was otherwise clearly wrong in denying her motion for a new trial because, in her view, the state failed to meet its burden of proving beyond a reasonable doubt that she did not act in self-defense when she (as her brief states) "grabbed a kitchen knife to protect herself from imminent death or serious bodily injury at the hands of Gary Mitchell."  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On October 15, 2009, defendant fatally stabbed Gary Mitchell after a violent altercation. Subsequently, on February 26, 2010, a Providence County grand jury returned an indictment charging defendant with the murder of Mr. Mitchell in violation of G.L. 1956 §§ 11-23-1 and 11-

23-2. In due course, a jury trial took place in May of 2011. We summarize below the salient aspects of what transpired at trial.

## A

## The Testimony of Dr. Alexander Chrikov

Doctor Alexander Chrikov, a medical examiner in the Office of State Medical Examiners, offered expert testimony as to the cause of Mr. Mitchell's death. He testified that, in his opinion, Mr. Mitchell died from a "[s]tab wound of the chest with injury of pulmonary artery and aorta;" he added that the manner of Mr. Mitchell's death was homicide.

## B

## The Testimony of Keneisha Roberts

Keneisha Roberts testified for the state. She testified that, on October 15, 2009, she was pregnant and living in one of the two rooms that were in the basement of a "three-family apartment house" on Harrison Street in Providence; she added that her grandfather, Norman Cornish, lived in the other room. Ms. Roberts further testified that Mr. Cornish's room was in the front of the basement closer to stairs that led outdoors, whereas her room was in the back. Several photographs of Mr. Cornish's room and the surrounding area in the basement were entered into evidence at trial; it appears from those photographs that inside Mr. Cornish's room, to the right of the door, there was a counter area with cooking utensils and cooking equipment. Those photographs further indicate that inside the room, to the left of the same door, there were a nightstand, a bed, and a television set. The photographs also indicate that there was a door from the basement hallway into Mr. Cornish's room and that, in order to go outside from the basement, one would have to walk up approximately seven or eight steps to a landing, up three more steps to a door, and then down five steps to the front lawn.

Ms. Roberts testified that, on the afternoon of the incident at issue, she observed Mr. Cornish and defendant "getting ready to smoke crack." She stated that sometime thereafter Mr. Cornish's friend, Gary Mitchell (the victim), arrived, went into Mr. Cornish's room, and shut the door. She added that, "after they were done smoking," she went inside Mr. Cornish's room to prepare some food, returning to her own room a short time later to take a nap.

Ms. Roberts stated that, earlier that day before she left to take a nap, she had observed that defendant and Mr. Mitchell were arguing about his taking her belongings, including her liquor and cigarettes—even though she had told him not to do so; Ms. Roberts also acknowledged that she and defendant had called Mr. Mitchell a "hypocrite" because, in their view, he participated in a church choir solely for the money. Ms. Roberts stated that, as it appeared to her, those two incidents caused Mr. Mitchell to become angry.

Ms. Roberts proceeded to testify that she was awakened from her nap by the sound of "screaming and crashing" coming from Mr. Cornish's room. She further testified that, when she entered Mr. Cornish's room, she saw Mr. Mitchell "choking [defendant] from behind and punching her in her face really hard." She stated that, although defendant was "chunkier" than Mr. Mitchell, he was "more muscular."[1] It was Ms. Roberts's testimony that she yelled at Mr. Mitchell to "get off of" defendant; it was her further testimony that she attempted to "physically try to remove him" but that her efforts to do so were unsuccessful.

Ms. Roberts testified that Mr. Cornish then entered the room, and she described what he did as follows:

> "My grandfather tried to get in-between them while Gary [Mitchell] was still choking Lakesha but finally he got ahold of

---

[1] The autopsy report prepared by Dr. Chirkov which was entered into evidence at trial indicates that Mr. Mitchell was five feet five inches tall. According to defendant's testimony, she is five feet three inches tall.

Gary and he was in the back of the room like bear hugging him, right, to keep him away from Lakesha because he was still trying to get to her."

Ms. Roberts testified that Mr. Cornish also moved a chair to the middle of the room while trying to maneuver Mr. Mitchell farther away from defendant. Ms. Roberts additionally testified that, even though Mr. Cornish was pulling Mr. Mitchell away from defendant, Mr. Mitchell nonetheless succeeded in pushing defendant into the door that led from the room to the hallway; she added that the door broke from the impact of defendant's body and that defendant then fell to the ground. It was Ms. Roberts's further testimony that, after being pushed into the door, defendant was "really stunned" and "started crying and going crazy and talking to herself." She testified that defendant said: "I can't believe you did this to my face. I can't believe you punched me in my face. How dare you[?]" Ms. Roberts stated that she observed defendant "reach to the top of the microwave to try to steady herself to get up" off the floor and that, in the process, defendant ended up knocking over certain kitchen items that were located on a piece of plywood above the microwave. According to Ms. Roberts's testimony, defendant then began searching for something on the counter and stopped doing so when she found "a big kitchen knife." Ms. Roberts stated that, when defendant grabbed the knife, she was approximately two inches from the damaged door, whereas Mr. Mitchell and Mr. Cornish were on the other side of the room (farthest from the door). Ms. Roberts also stated that defendant was still "ranting" at that point, saying: "I'll kill you, you missed [sic] up my face."

Ms. Roberts testified that then, because Mr. Cornish did not have a very good hold on Mr. Mitchell, he "ended up coming – as if he was coming toward [defendant]." She added that, at that point, defendant "was going toward him so it was like they were lunging at each other." It was Ms. Roberts's testimony that defendant took approximately five steps towards Mr. Mitchell

- 4 -

and that, when "[t]hey met in the middle" of the room, defendant stabbed him twice with the knife. Ms. Roberts stated that Mr. Mitchell then "fell on top of" the chair which was located between the two of them and that defendant then fell on top of Mr. Mitchell.[2] She further stated that she saw defendant attempt to stab Mr. Mitchell approximately three or four times during the incident at issue. She testified that she then left the room where the stabbing had occurred and went upstairs[3] to call an ambulance.

## C

### The Testimony of Norman Cornish

Norman Cornish, the grandfather of Ms. Roberts, also testified for the state. He testified that, on October 15, 2009, defendant had been staying with him in his room in the basement apartment on Harrison Street. Mr. Cornish further testified that, on that date, Mr. Mitchell came to the apartment and brought alcohol with him, which Mr. Mitchell and defendant began drinking.

Mr. Cornish testified that, at some point during that afternoon, he left the apartment for approximately forty-five minutes and that, upon his return, defendant told him, in Mr. Mitchell's presence, that Mr. Mitchell was "disrespecting her, * * * was taking her beers [and] cigarettes and * * * was making sexual advances towards her." Mr. Cornish also stated that, although Mr. Mitchell had remained quiet while defendant was talking, she went over to Mr. Mitchell and

---

[2]    On recross-examination, Ms. Roberts answered in the affirmative when asked if Mr. Mitchell fell "[b]ackwards in the area of the chair." Ms. Roberts's testimony is therefore unclear as to whether Mr. Mitchell had in fact advanced past the chair towards defendant before he was stabbed.

[3]    Despite Ms. Roberts's testimony that she left Mr. Cornish's room and went upstairs after the stabbing, she responded in the affirmative when asked on cross-examination "if [defendant] had wanted to exit that room, the door was broken, right?" She also acknowledged that there was debris in front of the broken door. She additionally testified that, when the paramedics arrived, they broke off part of the door to get inside Mr. Cornish's room.

"gave him a little slap behind the ear." He added that defendant then grabbed a two-prong fork used for "carving food" and held it to the side of Mr. Mitchell's neck, stating: "[Y]ou don't want to see the bad side of me." He further testified that defendant, at his request, gave him the fork, which he put away. He said that he thereafter went outside to take out the garbage.

Mr. Cornish testified that, on his way back to the basement, he heard Ms. Roberts saying: "[G]et off of her, Gary; stop sitting [on] her, Gary; leave her alone, Gary." Mr. Cornish further testified that, when he opened the door to his room, he saw Mr. Mitchell "choking [defendant] up against the wall." When Mr. Cornish was confronted on cross-examination with his October 15th statement to the police, he stated (describing the incident in a manner that differed from what he had said on direct examination) that he told Mr. Mitchell to let defendant go and that he "grabbed" him and "took his hands away" from defendant. Mr. Cornish stated that Mr. Mitchell then shoved defendant backwards with his hand and that she "fell back and hit the door," which he stated was "totally demolished" from the impact of her body; he added that she also "knocked over the shelf [in the kitchen area] where the knife was" resting.

Mr. Cornish stated that, at that point, defendant was in front of the door and that he and Mr. Mitchell were at the back of the room, approximately four to five feet away from her. Mr. Cornish testified that Mr. Mitchell, whom he described as being "calm" and not "violent" at that time, then took a step forward towards defendant. Mr. Cornish further testified that defendant stood up from the floor with the knife in her hand; he added that he believed that Mr. Mitchell was trying to leave, but backed up when he saw the knife in defendant's hand. It was Mr. Cornish's testimony that defendant thereafter took three steps towards Mr. Mitchell and then "struck him three times" with the knife. Mr. Cornish stated that defendant and Mr. Mitchell then

both fell to the floor and that defendant, at his request, gave him the knife, which he placed outside his room.[4]

## D

### The Defendant's Motion for a Judgment of Acquittal

At the close of the prosecution's case, defense counsel made a motion for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, which motion was directed at only the charge of first-degree murder. The trial justice granted defendant's motion. After the trial justice's ruling on the Rule 29 motion, the defense then proceeded to present its case.

## E

### The Testimony of Defendant

The defendant, Lakesha Garrett, testified in her own defense. She testified that, on October 15, 2009, she was at Mr. Cornish's apartment on Harrison Street, where Mr. Mitchell and Ms. Roberts were also present. She acknowledged on cross-examination that she had gone there "to use crack cocaine." However, Ms. Garrett denied having used crack cocaine on the day of the stabbing—although she acknowledged that the results of the tests performed at the hospital after the stabbing indicated the presence of cocaine in her bloodstream.

It was defendant's testimony that, at some point during the day when she was alone with Mr. Mitchell in Mr. Cornish's room, he had taken her cigarettes from her lap and had touched her arms, breasts, and "between [her] legs;" she added that that touching "went on for quite a while." She stated that Mr. Mitchell's conduct made her a "little upset" but "[n]ot angry;" and she denied smacking Mr. Mitchell's head, holding a meat fork to his neck, or threatening him.

---

[4] The state presented additional witnesses at trial; however, we need not detail their testimony.

The defendant's testimony was impeached by a recorded statement that she gave to the Providence police on October 16, 2009, which was played for the jury and entered into evidence as an exhibit, in which statement defendant admitted that she had threatened Mr. Mitchell. When the prosecutor asked defendant on cross-examination whether she had made such a statement to the police, she replied: "I did not say that."

The defendant testified that, when Mr. Cornish left the apartment for the second time that day, she attempted to leave as well. However, she said that, as she was gathering her belongings on Mr. Cornish's bed with her back turned towards Mr. Mitchell, he hit her head from behind.[5] According to her testimony, Mr. Mitchell was choking her and punching her in the face when Ms. Roberts came into the room and screamed at Mr. Mitchell to "get off of her." She testified that, at some point, she broke free from Mr. Mitchell, but she added that Mr. Mitchell was still holding her when she took "three steps" across the room to the area near the microwave. It was her testimony that she saw a spatula and then a knife; and, in explaining her decision to pick up the knife instead of the spatula, defendant stated that she "knew a spatula wasn't going to keep him off of [her]." With respect to her intention when she picked up the knife, defendant stated: "I didn't intend to hurt him. * * * I just wanted to keep him off of me. I only intended to brandish the knife." According to defendant, she "thought [Mr. Mitchell] was going to kill [her]." When defendant was asked whether she was able to walk out of the apartment at any point during the incident, she stated: "I was not turning my back on [Mr. Mitchell]."

---

[5] The defendant answered in the negative when asked on cross-examination whether she did anything to provoke Mr. Mitchell. However, she stated that "the hypocrite thing" (referring to the incident when she and Ms. Roberts called Mr. Mitchell a hypocrite, (see Part I.B, supra)) and her telling Mr. Cornish about Mr. Mitchell having taken her cigarettes and having touched her inappropriately made Mr. Mitchell "really angry."

The defendant testified on direct examination that she did not know how she stabbed Mr. Mitchell; she stated, however, that what she remembered about the altercation was that she "had the knife in [her] left hand and * * * was kind of hoarding [sic] off blows" from Mr. Mitchell. She subsequently testified on cross-examination that she had "just poked" him with the knife.[6] She further testified that she did not remember how many times she had "poked" him, but she recalled that "all of a sudden" "he sat down in the chair," which she testified was behind him.

The defendant's testimony differed from that of Ms. Roberts and Mr. Cornish in some respects; and, at times, she also contradicted herself. During the course of her testimony, defendant denied several times that Mr. Cornish had been in the room during the altercation and that he had restrained Mr. Mitchell. It was additionally defendant's testimony that no one (neither Ms. Roberts nor Mr. Cornish) attempted to pull Mr. Mitchell away from her. She claimed that Mr. Mitchell "never let off of" her during the incident, stating: "[H]e was behind me the whole time. I was trying to get to the door. I never got away from him." Subsequently, however, the prosecutor asked defendant on cross-examination whether she was "standing at the door" after Mr. Mitchell pushed her into it. In response, defendant stated that she was not standing but was instead "on the floor;" and she responded in the negative when asked if Mr. Mitchell was also on the floor. She nonetheless later stated, also on cross-examination, that she did not remember being pushed into the door and that she had not been able to reach the door before she stabbed Mr. Mitchell. When the prosecutor asked defendant on cross-examination

_____

[6]     The record indicates that, when defendant testified that she "poked" Mr. Mitchell with the knife, she also (in the words of the trial justice in ruling on defendant's new trial motion) "demonstrated [that motion] at trial by waiving [sic] her knife-wielding arm above her shoulders and thrusting the knife into the air."

Doctor Chirkov, the medical examiner, testified that Mr. Mitchell was stabbed five times in total; he added that, while four of the stab wounds were superficial, the fatal stab wound was the result of the penetration of the chest cavity to a depth of approximately four inches. The autopsy report indicated that four of the stab wounds were inflicted in a "downward" direction.

whether she remembered "ranting and raving and yelling about the fact that [Mr. Mitchell] hit [her] face," she responded: "That did not happen." She also denied walking towards Mr. Mitchell before stabbing him—in contrast to her account of the incident in the above-referenced recorded interview with the Providence police, during which she stated: "But, I turned around. I don't know how I turned around. I began walking, I remember that." (Emphasis added.)

**F**

**The Jury Instructions, the Verdict, the New Trial Motion, and the Sentencing**

After the closing arguments, the trial justice instructed the jury with respect to the law of second-degree murder, voluntary manslaughter, and the defense of self-defense. On May 26, 2011, the jury rendered its verdict; it acquitted defendant of second-degree murder, but it returned a verdict of guilty on the lesser-included offense of voluntary manslaughter.

On June 3, 2011, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. After a hearing was held on that motion on August 1, 2011, the trial justice denied it. In a decision that occupies some forty transcript pages, her ultimate conclusion was as follows:

> "[A]fter a thorough examination of all of the evidence, this Court finds that there was sufficient evidence for the jury to find beyond a reasonable doubt both that the State negated defendant's self-defense and the defendant committed the crime of manslaughter."

In due course, the trial justice sentenced defendant to twenty years imprisonment, with nine years to serve and eleven years suspended, with probation. A timely notice of appeal was filed.

**G**

**The Defendant's Appellate Contentions**

The defendant appeals only the trial justice's denial of her motion for a new trial. Her appellate argument is based on the law of self-defense. The defendant contends that a new trial

- 10 -

is warranted because, in her view, the trial justice clearly erred and misconceived or overlooked material evidence in denying her motion since "[r]easonable minds could not differ that [defendant's] use of deadly force against the substance-crazed and enraged Gary Mitchell was indisputably in self-defense and, accordingly, * * * the killing was justified under the circumstances then pertaining." The defendant makes two separate arguments: (1) that defendant "did not use excessive force when she stabbed [Mr.] Mitchell in self-defense because she was the victim of an unlawful and violent physical attack which left her in reasonable fear of imminent death or serious bodily injury;" and (2) that defendant "was justified in using deadly force against [Mr.] Mitchell in self-defense because, at the time of the confrontation, she was not consciously aware of an open, safe and available avenue of retreat."

## II

### Standard of Review

When a trial justice considers a motion for a new trial, he or she "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also State v. Clay, 79 A.3d 832, 841 (R.I. 2013); State v. Rosario, 35 A.3d 938, 947 (R.I. 2012). In carrying out that role, the trial justice must "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012) (internal quotation marks omitted); see also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Paola, 59 A.3d 99, 104 (R.I. 2013). If, after conducting that three-step analysis, "the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict

should be affirmed." State v. Harrison, 66 A.3d 432, 445 (R.I. 2013) (internal quotation marks omitted); see also Rosario, 35 A.3d at 947; State v. DeOliveira, 972 A.2d 653, 665 (R.I. 2009).

We have "indicated that the record should reflect a few sentences of the [trial] justice's reasoning on each point." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted). However, this Court has also stated that "[i]n providing a rationale for a decision * * * the trial justice * * * need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Id. (internal quotation marks omitted).

We note that, on appeal, "the moving party bears the burden of convincing this [C]ourt that the trial justice did not conscientiously apply these standards." State v. Guerra, 12 A.3d 759, 766 (R.I. 2011) (internal quotation marks omitted); see also State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994). In reviewing a ruling on a new trial motion, "[i]f the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Paola, 59 A.3d at 104 (internal quotation marks omitted); see also Guerra, 12 A.3d at 766; State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008).

When we review a trial justice's credibility determinations, "we do not focus on whether, this Court simply agrees or disagrees with the trial justice's credibility determinations," but rather we are "deferential to those determinations," Clay, 79 A.3d at 842 (internal quotation marks omitted); and "we will not overturn [such determinations] unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." State v. LaPierre, 57 A.3d 305, 311 (R.I. 2012) (internal quotation marks omitted). This Court has stated

on more than one occasion that we afford "a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." Paola, 59 A.3d at 106 (internal quotation marks omitted); see also DiCarlo, 987 A.2d at 872.

## III

## Analysis

## A

## The Trial Justice's New Trial Ruling

It should be noted that defendant does not challenge the trial justice's determination that there was sufficient evidence presented at trial whereby a reasonable jury could have found that defendant was guilty beyond a reasonable doubt of voluntary manslaughter, but she does vigorously challenge the trial justice's determination that a reasonable jury could have found that defendant's self-defense argument was unconvincing.

In order to put in proper perspective the trial justice's denial of defendant's motion for a new trial, it is necessary to briefly summarize the law in this jurisdiction regarding the defense of self-defense. This Court has articulated the legal principles relative to the defense of self-defense as follows:

> "Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his own protection. The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts, but in no set of

circumstances may one apply more than that degree of force necessary to prevent bodily injury." State v. Linde, 876 A.2d 1115, 1129 (R.I. 2005) (internal quotation marks omitted); see also State v. D'Amario, 568 A.2d 1383, 1385 (R.I. 1990).

Before resorting to the use of deadly force, however, "individuals [who are] attacked must attempt to retreat if they are consciously aware of an open, safe and available avenue of escape." State v. Silvia, 836 A.2d 197, 200 (R.I. 2003) (internal quotation marks omitted); see also State v. Rieger, 763 A.2d 997, 1003 (R.I. 2001). It is also well settled that "one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation." State v. Pineda, 13 A.3d 623, 631 (R.I. 2011) (internal quotation marks omitted); see also State v. Martinez, 652 A.2d 958, 961 (R.I. 1995). We have stated that the "very essence of the defense of self-defense [hinges on] how the defendant perceived the situation at the time of the incident in question." D'Amario, 568 A.2d at 1385 (internal quotation marks omitted); see also Linde, 876 A.2d at 1129. We have also stated that "[o]nce a defendant introduces evidence of self-defense, the burden is on the state to negate that defense beyond a reasonable doubt." State v. Urena, 899 A.2d 1281, 1288 (R.I. 2006); see also In re John Doe, 120 R.I. 732, 742, 390 A.2d 920, 926 (1978). Bearing these principles in mind, we next turn to the trial justice's consideration of defendant's motion for a new trial.

In accordance with the first step in the new trial analytical process, the trial justice properly considered the evidence in light of the jury charge. The trial justice acknowledged that defendant had introduced adequate evidence to raise the issue of self-defense, which defense was referenced in the instructions to the jury. The trial justice stated that the jury could not have convicted defendant of voluntary manslaughter without first concluding that the state had negated the defense of self-defense beyond a reasonable doubt. She proceeded to consider the evidence in light of the settled law of self-defense. The trial justice comprehensively

- 14 -

summarized the trial proceedings in an "extensive fashion to ensure that all material aspects of the trial evidence, much of which was disjointed and confusingly presented," were considered in her ruling; and she candidly noted the consistencies and inconsistencies in the evidence.

The trial justice then reached the second step of the required analysis, and independently assessed the credibility of the witnesses and the weight of the evidence. She found the testimony of Ms. Roberts to be the most credible, stating as follows:

> "[R]easonable jurors could have accepted the testimony of Keneisha Roberts as to how the stabbing incident occurred, it was the most credible testimony and the most complete and lacking inconsistencies of the witnesses. And she was the most disinterested * * * .
> "In addition, she had not been drinking and smoking crack, presumably, like all the others had."

By contrast, with respect to the testimony of defendant, the trial justice found as follows:

> "Defendant's testimony was replete with inconsistencies and reflected a woman trying to reconstruct events to match how she felt at the time or attempt to justify her actions based on those feelings after the facts."

It was the trial justice's opinion (largely based on her crediting of Ms. Roberts's testimony as to the brutality of the altercation between defendant and Mr. Mitchell) that a reasonable juror could have determined that, earlier on October 15, 2009, "defendant actually believed she was in imminent danger of bodily harm and had reasonable grounds for that belief * * * ." Significantly, however, the trial justice further found that Mr. Mitchell's shoving of defendant into the door constituted a "break in [that] action that affected the analysis of the evidence" from that point on. The trial justice explicitly noted that, after defendant was shoved into the door, she was on the opposite side of the room from Mr. Mitchell, who was being "guard[ed]" by Mr. Cornish, and the trial justice also noted that there was a chair between Mr.

Mitchell and defendant.[7]  The trial justice then expressly considered the fact that defendant thereafter chose to pick up the knife (instead of the spatula), did not seek to leave the room (even though she was closer to the exit than was Mr. Mitchell), and walked "at least five steps" towards Mr. Mitchell (who was unarmed) before she stabbed him.  The trial justice acknowledged that "a reasonable jury could have found that defendant subjectively believed she still was in imminent danger of bodily harm from Mr. Mitchell at this point in time perhaps because the defendant's view of the situation was colored by emotion and the ingestion of substances."  But the trial justice also determined that a "reasonable jury could have found at that point the defendant was no longer in reasonable fear of imminent bodily harm and that she became the aggressor to retaliate in anger against Mr. Mitchell for his past deeds * * * ."

The trial justice then stated that, even if the jury found that defendant still believed she was in danger of imminent harm, it could have found that, by "plunging a knife four inches into [Mr. Mitchell's] chest," defendant used an amount of force that was not reasonably necessary for her own protection.  The trial justice found "defendant's testimony as to how she stabbed upward blind and into the air in fending off Mr. Mitchell" not to be credible, whereas she found the testimony of Ms. Roberts with respect to the stabbing to be credible.  The trial justice also stated that it could be inferred from Ms. Roberts's testimony that defendant's "goal * * * seemed to be to stab Mr. Mitchell in the chest rather than stab to deter."  The trial justice noted that "the autopsy report * * * showed downward stab wounds consistent with the defendant being the

---

[7]  The defendant contends on appeal that the trial justice overlooked evidence that, in advancing towards defendant prior to the stabbing, Mr. Mitchell "maneuvered beyond [the] chair."  However, it was the opinion of the trial justice that, after considering the photographs of Mr. Cornish's room in light of his testimony describing the respective locations of defendant and Mr. Mitchell prior to the stabbing and Ms. Roberts's testimony that they met at the chair, "a jury could have reasonably concluded that Mr. Mitchell made little, if any, advancement toward defendant and defendant had to cross a much greater length of the room in order to ultimately stab Mr. Mitchell."

aggressor." Additionally, with respect to defendant's ability to retreat, the trial justice stated that:

> "[D]efendant did not first try to retreat, even though she was near the door and armed. She could have chose[n] to leave, albeit having to stumble over debris and with the risk that Mr. Mitchell would follow by backing her way out of the room and up the stairs while remaining armed with a knife instead of walking toward and lunging at Mr. Mitchell in a crazed state."

Accordingly, the trial justice found that "reasonable jurors could have found that [defendant] had an open, safe, available avenue of escape that was not sufficiently blocked in making it unopen or unavailable."

Moving next to the third step in the new trial analytical process, the trial justice recognized that she was confronted with "a close case of self-defense" in view of what she described as the "abhorrent, violent actions of Mr. Mitchell toward defendant" preceding the stabbing, as well as the "drug and alcohol fueled emotions and distorted perceptions of both the defendant and victim." Ultimately, however, the trial justice concluded that there was sufficient evidence for the jury to have found that the state had negated defendant's defense of self-defense beyond a reasonable doubt. Then, pursuant to step three of the required analysis, the trial justice proceeded to state:

> "This Court is in accord with the jury's verdict, a sensible one given all of the evidence, and finds that this does indeed do justice in this case."

At that point, the trial justice denied defendant's motion for a new trial. See Guerra, 12 A.3d at 765 (stating that if, after conducting the required three-step analysis, the trial justice agrees with the jury's verdict, "then the inquiry is at an end and the motion for a new trial should be denied").

## B

## The Defendant's Challenge to the Denial of a New Trial

The defendant contends that the trial justice overlooked and misconceived material evidence and was otherwise clearly wrong in denying her motion for a new trial since, in her view, the state failed to meet its burden of proving beyond a reasonable doubt that she did not act in self-defense when she stabbed Mr. Mitchell. The defendant presents two arguments in support of that contention, which we shall now address.

The defendant first asserts that she did not use excessive force when she stabbed Mr. Mitchell because "she was the victim of an unlawful and violent physical attack which left her in reasonable fear of imminent death or serious bodily injury." The defendant contends that, in determining whether her use of deadly force was reasonable, the trial justice overlooked and misconceived evidence with respect to defendant's physical condition after Mr. Mitchell's assaultive conduct; in support of that contention, she cites State v. Fetzik, 577 A.2d 990 (R.I. 1990), and In re Paul F., 543 A.2d 255 (R.I. 1988). Although defendant correctly states that, under our law of self-defense, the reasonableness of a defendant's actions must be considered in light of the then-present conditions and circumstances, including his or her physical condition, we cannot say that the trial justice's analysis of the facts was clearly erroneous in that respect.

The defendant argues that, as a result of her altercation with Mr. Mitchell, she was in a "weakened condition," "[e]xhausted," and "disoriented" at the time that she picked up the knife and stabbed Mr. Mitchell. It is clear, however, that the evidence that defendant had been choked, repeatedly punched, and otherwise assaulted by Mr. Mitchell was before the jury and was referred to by the trial justice in her ruling on defendant's motion for a new trial. The trial justice specifically noted that Mr. Mitchell had perpetrated "particularly horrendous physical abuse"

against defendant, which had "almost killed" her. Accordingly, we discern no merit in defendant's argument that the trial justice overlooked and misconceived material evidence with respect to defendant's physical condition in determining that a reasonable jury could find that defendant's use of deadly force was unreasonable under the circumstances.[8]

The defendant's second argument is that she was justified in using deadly force against Mr. Mitchell in self-defense because, "at the time of the confrontation, she was not consciously aware of an open, safe and available avenue of retreat." The defendant emphasizes that "the existence of an 'open' and 'available' means of egress was dubious" in light of the evidence that the exit door was broken, that there was debris in front of it, and that defendant would have had to turn her back to Mr. Mitchell and navigate the stairs out of the basement. It will be recalled, however, that the trial justice specifically considered those facts in her ruling, finding that defendant could have chosen to leave "by backing her way out of the room," "albeit having to stumble over debris and with the risk that Mr. Mitchell would follow [her] * * * ." We are unable to conclude that the trial justice clearly erred in finding that a reasonable jury could have found that there was an "available avenue of escape that was not sufficiently blocked in making it unopen or unavailable" and that, consequently, defendant was, as our law requires, obliged to attempt to retreat before using deadly force. See Silvia, 836 A.2d at 200; see also Rieger, 763 A.2d at 1003. The defendant also argues that, because the paramedics had to "break * * * down"

---

[8]      Before this Court, defendant attempts to frame an argument that the reasonableness of her actions should have also been considered in light of what she contends is "her substantial girth and probable physical unfitness." However, due to the fact that such an argument was not raised at any point before the trial court, it has not been preserved for appellate review. See State v. Merida, 960 A.2d 228, 236 (R.I. 2008) ("This Court's well-settled raise-or-waive rule precludes us from considering at the appellate level issues not properly presented before the trial court.") (internal quotation marks omitted); see also State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011) ("This Court staunchly adheres to the raise or waive rule, which requires parties to raise an issue first in the trial court before raising it on appeal.") (internal quotation marks omitted).

the door in order to get inside Mr. Cornish's room, one could assume that defendant was unable to get out of Mr. Cornish's room, but the evidence presented at trial indicated otherwise. Although the trial justice stated that Ms. Roberts's testimony may have suggested that the damage to the door hindered defendant's ability to leave, it was also elicited at trial that both Mr. Cornish and Ms. Roberts were able to exit the room through the door after the stabbing and before the paramedics arrived.

## C

### The Defendant's Challenge Is Unavailing

The defendant has failed to convince us that the trial justice did not "conscientiously apply" the requisite standard in ruling on her motion for a new trial. Guerra, 12 A.3d at 766 (internal quotation marks omitted). Before denying the defendant's motion, the trial justice properly considered the evidence in light of the jury charge, thoroughly reviewed all of the facts adduced at trial in assessing the credibility of the witnesses and weighing the evidence, and ultimately stated that she was in accord with the jury's verdict. It is evident that the trial justice employed the appropriate analytical approach and that she performed her role as the thirteenth juror carefully, articulating a more than adequate rationale for her decision. In light of the deferential standard that governs our review of a trial justice's findings and conclusions in the context of a motion for a new trial, we are unable to conclude that the trial justice in this case was either clearly wrong or that she overlooked or misconceived material and relevant evidence in her denial of the defendant's motion for a new trial. See Clay, 79 A.3d at 842; State v. Adefusika, 989 A.2d 467, 481 (R.I. 2010).

# IV

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.  The record in this case may be remanded to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Lakesha Garrett.

**CASE NO:**        No. 2012-3-C.A.
                              (P1/10-680A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   May 30, 2014

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                              Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

                              For State:  Lauren S. Zurier
                                          Department of Attorney General

                              For Defendant:  Catherine Gibran
                                          Office of the Public Defender